**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PAUL MYVETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 09464 |
| | ) | |
| CHICAGO POLICE DETECTIVE | ) | Judge John J. Tharp, Jr. |
| EDWARD HEERDT, STAR NO. 20598; | ) | |
| CHICAOG POLICE DETECTIVE | ) | |
| LLOYD ALMDALE, STAR NO. 20060; | ) | |
| CHICAGO POLICE OFFICER GEORGE | ) | |
| KALFAS, STAR NO. 19329; CHICAGO | ) | |
| POLICE OFFICER PATRICK BARKER, | ) | |
| STAR NO. 1390, individually and as | ) | |
| Employee/Agents of the City of Chicago, a | ) | |
| Municipal Corporation, and THE CITY OF | ) | |
| CHICAGO, a Municipal Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

For the reasons set forth in the Statement below, the motion for partial summary judgment of plaintiff Paul Myvett, Dkt. 71, is denied. The motion for partial summary judgment of defendants the City of Chicago and Chicago police officers Edward Heerdt, Lloyd Almdale, Patrick Barker, and George Kalfas, Dkt. 65, is granted as to Officer Kalfas, and otherwise denied. A status hearing is set for June 11, 2015, at 9:00 a.m. to set a trial date.

## STATEMENT

Myvett filed this action in November 2012 against the City of Chicago and police officers Heerdt, Almdale, Barker, and Kalfas, alleging constitutional and state law claims in connection with Myvett's arrest and incarceration pending trial for a November 2010 shooting at a Chicago White Castle restaurant. *See* Compl., Dkt. 19, ¶¶ 5-23. Myvett alleges that the officers conspired to, and did, fabricate evidence against him and suppress exculpatory evidence demonstrating that Myvett was not the shooter in this incident. *Id.* Myvett also alleges that Officer Kalfas used excessive force during Myvett's arrest. *Id.* at ¶ 9. Myvett's First Amended Complaint ("complaint") includes counts alleging violation of due process (Count II), conspiracy (Count III), malicious prosecution (Count IV), excessive force (Count V), and indemnification (Count VI). *Id.* at ¶¶ 28-49. Jurisdiction is based on 28 U.S.C. §§ 1331, 1343, and 1367. *Id.* at ¶ 2.[1]

---

[1] Initially, Myvett also joined as defendants Chicago police officers George Ghorbanian and Scott White, but voluntarily dismissed them from the case in July 2014, *see* Dkt. 64; asserted

Now before the Court are cross motions for partial summary judgment. Dkts. 65 and 71. Myvett moves for summary judgment on his due process and conspiracy claims (Counts II and III) as to all defendants, Dkt. 71, ¶¶ 1-2, and on his malicious prosecution claim (Count IV) as to Officers Heerdt and Almdale. *Id*. at ¶ 3. All defendants seek summary judgment on Myvett's due process and conspiracy claims. Dkt. 65 ¶¶ 2-3. For the following reasons, the defendants' motion is granted as to Officer Kalfas. Otherwise, both motions are denied because each raises genuinely disputed issues of material fact requiring a trial.

## BACKGROUND[2]

Myvett claims he was charged for the November 27, 2010, shooting and attempted murder of Reginald Allen based on false police statements, and that the state's attorney represented during his bond hearing—also based on false police statements—that Myvett was the shooter in that incident, although Chicago police officers knew by then that the other person arrested that night (Wilbur Jackson)—not Myvett—shot Allen. *See* Myvett SOF, Dkt. 69, ¶¶ 34-73. Myvett thus contends that the state's attorney used "false information" indicating that Myvett "was identified as the shooter" to "persuade the bond court judge to set Plaintiff's bond at $250,000.00, an amount he could not raise," Myvett Opp., Dkt. 86, at 9, and higher than for the actual shooter (Jackson), whose bond was set at $150,000.00. *See* Myvett Ex. S, Dkt. 69-20, at 4.

As a result, Myvett alleges, he remained in maximum security at the Cook County Department of Corrections for thirteen months pending trial. Myvett Reply, Dkt. 94, at 7; Myvett SOF, Dkt. 69, ¶¶ 73, 77. Myvett says when he was finally tried, "not a single witness" identified him "as shooting Reginald Allen" or "as possessing or struggling for a gun" during the incident. Myvett SOF, Dkt. 69, ¶ 75. Although the defendants dispute this latter assertion, *see* Def. Resp. to Myvett's SOF, Dkt. 81, ¶ 75, it is undisputed that Myvett ultimately was acquitted on a directed finding at the close of the state's case. *See* Answer, Dkt. 26-1, ¶ 23 and n.1. According to Myvett, the investigators assigned to the case, Heerdt and Almdale, knew that Myvett did not shoot Allen even before his bond hearing (and, thus, before Myvett was wrongly incarcerated for the next thirteen months) because:

(1) within hours of Myvett's arrest, the victim (Allen) told Officers Heerdt and Almdale that he was "100% certain that Jackson had control of the gun and that Jackson is the man who shot him," Myvett SOF, Dkt. 69, ¶¶ 16, 52; Myvett Ex. K, Dkt. 69-12, at 23;

---

a claim for false arrest (former Count I), but voluntarily dismissed that claim after defendants' motion for summary judgment was filed, *see* Dkts. 77-79; and asserted his malicious prosecution claim (Count IV) against all officers, but voluntarily dismissed that claim against Officers Barker and Kalfas also after their motion for summary judgment was filed. *Id*.

[2] As each party's cross motion for summary judgment separately requires "construing all facts and drawing all inferences in the light most favorable to the non-moving party," *Lagestee-Mulder, Inc. v. Consol. Ins. Co.*, 682 F.3d 1054, 1056 (7th Cir. 2012), the Court will "construe all inferences in favor of the party against whom the motion under consideration is made." *Tompkins v. Central Laborers' Pension Fund*, 712 F.3d 995, 999 (7th Cir. 2013) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

(2) another officer (Sage Allenson) had told Heerdt and Almdale that Allen identified the shooter as wearing "black gym shoes with red shoelaces," which Jackson, not Myvett, was wearing, Myvett SOF, Dkt. 69, ¶¶ 8, 11, 18;

(3) a witness who Almdale interviewed (Demetrius Barry) later testified that the person who pulled the gun was wearing a torn puffy coat—which Jackson, not Myvett, was wearing—and that he believed he would have given that information to police immediately after the incident "because it is the most distinct detail of the night's events that he can recall," *id.* at ¶¶ 19, 42-43; and

(4) a White Castle surveillance video that Heerdt reviewed the night of the shooting showed Myvett leaving the restaurant before witnesses later fled when the gun was pulled, contradicting accounts Almdale claims he took from two of those witnesses (Demetrius Barry and Martin Corbello) identifying Myvett as the one that pulled the gun. *Id.* at ¶¶ 22, 24-29.

Regarding the White Castle surveillance video, Myvett asserts (and the defendants do not dispute) that Officer Almdale realized within a day of the incident that any witness accounts "of Myvett pulling a gun were inconsistent with the video surveillance from the White Castle because the video showed that Myvett was outside the restaurant when someone on the east side of the restaurant pulled a gun out," causing those witnesses "to flee from the restaurant." Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 24-26, 28, 30. Myvett also maintains that Officers Heerdt and Almdale discussed the contradictions between the witness accounts they claim to have obtained and the surveillance video, *id.* at ¶¶ 29-30, and this also appears to have been within a day of the incident, and thus before Officer Almdale completed his report and before the case was presented to the grand jury. *Id.*; Def. Ex. G, Dkt. 80-7, at 175-76.

Nevertheless, Myvett argues, rather than "using this videotape as an investigatory tool to determine who was truly culpable" (and when "implicating Plaintiff as the shooter failed after Mr. Allen positively identified Mr. Jackson"), "the Defendants fabricated false identifications and witness statements designed to make Plaintiff legally accountable for the shooting by either providing the gun to Mr. Jackson and/or struggling for control of the gun with Mr. Allen." Myvett Mem., Dkt. 75, at 8, 14. Specifically, Myvett contends that Officer Almdale's report of the investigation fabricated the following witness statements:

(1) statements by the victim (Allen) that Myvett was "the other man he [Allen] was struggling with . . . for the gun" and that Myvett "jumped on his back" and "was punching him," Myvett SOF, Dkt. 69, ¶¶ 54-65; Myvett asserts that "Allen never told the Defendants or any other police officer that Plaintiff was involved in the struggle over control of the gun," or that Myvett "attacked him" or "was one of the people he was fighting," *id.* at ¶¶ 54, 56;

(2) statements by one of the witnesses who fled the restaurant when the gun was pulled (Corbello) that "Myvett pulled out the gun" and "Myvett and Jackson struggled for control of the gun," *id.* at ¶ 34; according to Myvett, "Corbello never identified Myvett as doing any of these actions," *id.*; and

(3)  statements by another such witness (Carla Huffman) that "both Jackson and Myvett started punching Allen" and "Allen traded punches with Jackson and Myvett," *id.* at ¶¶ 38-40; according to Myvett, "Huffman never stated that she saw Myvett fighting with Allen and Jackson." *Id.* at ¶ 39.

Myvett also asserts that the arrest report attested to by Officer Kalfas, and the case incident report approved by Officer Barker, each falsely stated that Myvett had been identified by witnesses as the offender who shot Allen, when in fact no witness had so identified him. *Id.* at ¶¶ 45-51. But while Officer Kalfas attested to the arrest report, it is unclear who actually prepared it. *See* Myvett Resp. to Def. SOF, Dkt. 82, ¶ 42 ("An arrest report was prepared by Defendant Kalfas and/or Officer Ghorbanian"). And while there is no dispute that the statements in the arrest and case incident reports indicating that Myvett shot Allen (and of witnesses identifying Myvett as the shooter) were inaccurate, the defendants maintain that neither Kalfas nor Barker "interviewed the witnesses to the White Castle incident at the 20th District police station" or "authored reports summarizing those interviews," and that this information came instead from "other officers." Def. Mem., Dkt. 67, at 3.

Myvett argues, however, that Officer Barker conducted a "show-up procedure" at the White Castle "in a manner that permitted him and other officers to create false identifications of Plaintiff as the shooter in this case." Myvett Mem., Dkt. 75, at 8-9. According to Myvett, "Sgt. Barker established himself as the sole person interacting with the witnesses at the time they viewed Plaintiff and Wilbur Jackson," "asked the deliberately obtuse question of whether either of the suspects were involved in the incident" (instead of "attempting to ascertain who fired the shot at Allen"), and "did not document any of the responses or circumstances surrounding the show-up." *Id.* Myvett also maintains that, as the officer interacting with the witnesses at the show-up, Barker knew of the witness account that the gunman was wearing a "torn puffy coat" (because the witness believed he would have given that information to the police at the show-up), and that Jackson (not Myvett) fit that description. *Id.* at 4, 9; Myvett Opp., Dkt. 86, at 4, 14; Myvett Reply, Dkt. 94, at 8. Yet, the case incident report that Barker approved incorrectly stated that unnamed witnesses had positively identified Myvett as the shooter both to responding officers, and at the show up that Barker conducted. *Id.*; Myvett Ex. O; Dkt. 69-16, at 4.

This "intentionally vague show-up procedure," Myvett contends, "spawned" not only the case incident report that Barker approved, but also the inaccurate arrest report to which Kalfas attested, Myvett Mem., Dkt. 75, at 8; Myvett Opp., Dkt. 86, at 7, both of which were provided to the felony review state's attorney who approved the charges against Myvett. *See* Myvett Resp. to Def. SOF, Dkt. 82, ¶ 48; Def. Reply to Myvett Resp. to Def. SOF, Dkt. 90 ¶ 48. Myvett also contends that Officer Heerdt "gave false and perjured grand jury testimony to secure Plaintiff's indictment," Myvett Mem., Dkt. 75 at 2, by testifying that various witnesses (including the victim's friends, Cameron Thompson and Brien Smothers, "amongst others") placed Myvett as "struggling to maintain the weapon in an attempt to shoot Mr. Allen," and thus "participated in the shooting by trying to maintain control of the gun," Myvett SOF Ex. Q, Dkt. 69-18 at 6-7, when "no such witnesses" had said so. Myvett Opp., Dkt. 86, at 15; Myvett SOF, Ex. J., Dkt. 69-11, at 75-77, 136, 180-81; Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 70-72.

The defendants acknowledge that "no one saw the actual shooting," Def. Resp. to Myvett SOF, Dkt. 81, ¶ 20, and that the witness accounts in their reports of Myvett pulling or shooting a

gun proved to be inconsistent with the White Castle video. *Id*. at ¶ 24-26. But the defendants vigorously deny making any deliberately false statements in their reports or in Officer Heerdt's grand jury testimony. For support, they point to deposition testimony by Corbello stating that he may have initially identified Myvett as the offender who "took out a gun" and "struggled for control of the gun." *See* Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 34-35; Def. Reply, Dkt. 88, at 6. Although Myvett argues that Corbello also denied giving such initial accounts, *see* Myvett Reply to Def. SOAF, Dkt. 95, ¶ 7, the defendants explain that Corbello was "confused" when he said that. Def. Reply to Myvett SOAF, Dkt. 90, ¶¶ 2-3. The defendants also maintain that the victim (Allen) originally identified Myvett "as the other person that he was struggling with for control of the gun and fighting with," Def. Resp. to Myvett SOF, Dkt. 81, ¶ 54, although Allen's later testimony denied those statements as well. *Id*. at ¶ 58.

Finally, as to the statements about Myvett being involved in the fight incorrectly attributed to Huffman in Almdale's report, the defendants explain that "Huffman did not know the identities of the individuals involved in the White Castle incident when she gave her witness account, and that [Almdale] inserted the names of certain individuals in the supplemental report based on Huffman's descriptions and the surveillance video after the individuals had been identified." *Id*. at ¶ 39. Nevertheless, they argue, "Almdale also testified that initially he believed that the video showed Myvett fighting with Jackson and Allen, and that *at the time* he wrote the supplemental report, he believed 'it was Myvett' who had done the things described by Huffman." *Id*. (emphasis in original). The defendants thus argue that all of these accounts—"even if incorrect"—are consistent" with their reports. *Id*. at ¶¶ 34-35, 39, 54, 58.

The defendants also rely heavily on the undisputed fact that the video shows Myvett re-entering the restaurant after the witnesses had fled and before shots were fired. *See* Myvett Mem., Dkt. 75, at 3; Def. Opp., Dkt. 80, at 3. And while the parties dispute whether Myvett was involved in the struggle "outside of the frame of what was captured in the video," *see* Myvett Reply, Dkt. 94, at 1-2, the defendants point out that the video nevertheless shows Myvett "in the area before the shots were fired." Def. Opp., Dkt. 80, at 3.[3] This, they say, is "the reason" Myvett was charged, *id*., although it is undisputed that the video was not used at Myvett's trial because the state's attorney determined that it did not capture "the actual shooting." Def. Ex. O, Dkt. 80-15, ¶¶ 5-6; Myvett Reply to Def. SOAF, Dkt. 95, ¶ 3. Nor was it the reason given to the bond court judge or the grand jury, *see* Myvett SOF Ex. S (Bond Hearing Tr.), Dkt. 69-20, and Ex. Q (Grand Jury Tr.), Dkt. 69-18—after which Myvett (who Officer Heerdt had "recognized" on the video "from his work on prior cases")—"remained incarcerated in maximum security at the Cook County Department of Corrections for over 13 months until he was found not guilty of all charges." Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 23, 77; Myvett Ex. B, Dkt. 69-3, at 34-37.

---

[3] The defendants' descriptions of this part of the video vary. *Compare*, *e.g.*, Def. Opp., Dkt. 80, at 3 (Myvett was "in the area before the shots were fired"), *with id.* at 3-4 (Myvett was "standing over the victim immediately prior to the shots being fired"), *with id.* at 8, 9, and 11 (Myvett was "standing over the victim when the gunshots are fired," "when the shots occurred," and "at the time the two gun shots are fired"). *See also* Def. Resp. to Myvett SOF, Dkt. 81, ¶ 4 (Allen testified that Myvett "approached the area where Allen was struggling with Jackson, and was right above Allen and Jackson, reaching down to where the struggle was occurring, when Allen was shot.").

## ANALYSIS

### I.      Due Process Claim (Count II)

#### A.      The Parties' Arguments Regarding Seventh Circuit Case Law and Immunity

Both sides devote the bulk of their briefs to debating whether the Seventh Circuit has recognized a due process claim for police fabrication of witness statements. It has. *See Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015) ("In *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012), we expressly stated that 'a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of his liberty in some way.'") (brackets omitted). Indeed, the defendants conceded the point in their Response to Myvett's motion for summary judgment before attempting to retract it in their Reply. *See* Def. Reply, Dkt. 88 and n.2 ("In Defendants' response to Plaintiff's motion for summary judgment, Defendants concede that *Whitlock* has established a Due Process claim arising from fabrication of evidence. Upon further review of the case law, Defendants believe that the law regarding such Due Process claims is not firmly established in the Seventh Circuit." (citing *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012)). But in addition to being late (arguments advanced first in a reply brief are waived, *Nationwide Ins. Co. v. Central Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013)), the defendants had it right the first time.

Contrary to the defendants' argument in support of their attempted retraction, *Alexander* did not depart from *Whitlock's* recognition of a due process claim. Rather, the court found no violation there because the defendant suffered no liberty deprivation, having been released on bond on the day of his arrest. *See Saunders-El*, 778 F.3d at 560-61 (discussing *Anderson*). There is no question that a defendant who is incarcerated before trial (as Myvett was for thirteen months) establishes a due process violation if he can show that such incarceration was caused by fabricated evidence. *See id.* ("the alleged liberty deprivation came not from the initial arrest, but from the time spent in confinement *after* arrest," including "the eight months Zahrey spent in jail after having his bail revoked" (quoting *Alexander's* discussion of *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000)). *Bianchi v. McQueen*, No. 12-cv-00364, 2014 WL 700628 (N.D. Ill. Feb. 24, 2014), on which the defendants also rely, similarly observes that a due process claim arises where "the fabrication of evidence harmed the defendant before and not just during trial, because it was used to help indict him," so long as "the fabricated evidence resulted in [his] wrongful incarceration." *Id.* at *9-12 (quoting *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014)).

Nor is Myvett's due process claim "precluded by his state-law malicious prosecution claim under current Seventh Circuit precedent," as the defendants assert. Reply, Dkt. 88, at 8-9; Mem., Dkt. 67, at 10 ("Plaintiff's due process and malicious prosecution claims are redundant."). The Seventh Circuit's recent decision in *Saunders-El* dispels any notion that "a claim of evidence fabrication cannot form the basis of a due process claim under § 1983 and must instead be brought as a state law malicious prosecution claim." *Id.*, 778 F.3d at 560. Rather, as explained in authority cited by the defendants, what matters is whether the plaintiff can demonstrate a liberty deprivation as required for a due process claim or termination of the proceedings in his favor as required for a malicious prosecution claim. *Bianchi*, 2014 WL 700628, at *9-12. But the two are not mutually exclusive; a plaintiff who is incarcerated (as here) but later prevails—by overturning his conviction or (as here) by winning an acquittal—"may bring both." *Id.* at 11.

The defendants' attempt to invoke qualified immunity in opposition to Myvett's due process claim, *see* Def. Opp., Dkt. 67, at 7, is similarly flawed. "Fabricating evidence, including witness testimony, violates a clearly established constitutional right, such that qualified immunity does not shield the manufacturers of such evidence from liability." *Saunders-El*, 778 F.3d at 560); *see also Whitlock,* 682 F.3d at 585-86 (holding that use of fabricated evidence to effect a deprivation of liberty violates the Due Process Clause was clearly established well before 1987, when the relevant events in that case occurred). To the extent the defendants invoke absolute immunity for their trial testimony, however, *see* Def. Mem., Dkt. 67, at 9-10, they are correct. *See Khorrami v. Rolince*, 539 F.3d 782, 789 (7th Cir. 2008) (acknowledging Supreme Court and Seventh Circuit holdings that witnesses (including police officers) "who allegedly gave perjured testimony" are "absolutely immune from suit").[4]

But this ruling applies solely to the defendants' trial testimony. While such immunity has also been applied to grand jury testimony, *Hammond v. Kunard*, 148 F.3d 692, 695-96 (7th Cir. 1998), the only defendant who testified before the grand jury, Officer Heerdt, does not argue that he is immune from liability based on his grand jury testimony, and thus appears to have forfeited that claim of immunity (Myvett, however, appears to have "waived the waiver" by failing to note Heerdt's failure). In any event, the issue of Heerdt's grand jury testimony is not dispositive because any such immunity would not shield Heerdt from the impact of fabricated witness statements on all other aspects of Myvett's prosecution, including the state's attorney's decision to seek indictment in the first place. *See id.* at 696 ("the complaint focuses on the defendants' actions prior to the prosecutor's decision to take the case to the grand jury, not on their actual testimony on the matter").

Accordingly, Myvett's due process claim based on police reports in which the defendants allegedly attributed fabricated statements to various witnesses is proper under *Whitlock* and its progeny. *See*, *e.g.*, *Taylor v. City of Chicago*, -- F. Supp. 3d --, No. 14 C 737, 2015 WL 739414, *7 (N.D. Ill. Feb. 19, 2015) (sustaining due process claim alleging false police report stating witness "had identified Taylor from the lineup"); *Patterson v. Dorrough*, No. 10 C 1491, 2012 WL 5381328, *4 (N.D. Ill. Oct. 31, 2012) (denying summary judgment due process claim based on "the falsity of statements made by the arresting officers in their reports").

## B. Myvett's *Brady* Claim

To the extent Myvett's due process claim is instead founded on alleged *Brady* violations—the failure to disclose exculpatory evidence—it fails. As the defendants correctly argue, Myvett has identified no evidence that was withheld from him, including the White Castle surveillance video. *See* Myvett Resp. to Def. SOAF, Dkt. 95, ¶¶ 4-5. Rather, the premise of Myvett's argument here is that by failing to tell him that they fabricated witness statements—*e.g.* that Corbello "never identified Plaintiff as producing the gun," Myvett Opp., Dkt. 86, at 5—the defendants withheld evidence that would have strengthened Myvett's defense. The Seventh Circuit has repeatedly rejected such a theory. *See Saunders-El*, 778 F.3d at 562 (rejecting *Brady* claim based on officers' alleged dishonesty in failing to disclose fabrication of evidence, holding

---

[4] The Court does not read the complaint to assert any claim based on trial testimony, *see* Dkt. 1, ¶¶ 21, 29; Dkt. 19, ¶¶ 21, 29, but nevertheless addresses the defendants' argument.

that "our case law makes clear that *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution").

Myvett's attempt to cobble a *Brady* violation from the defendants' failure to create exculpatory reports reflecting witness statements that Myvett later uncovered in depositions fails for the same reason. Specifically, Myvett argues that the defendants withheld Barry's statement that the gunman as wearing a "torn, puffy coat" and Allen's statement that "the last time he saw Myvett, he was getting kicked in the face by Brien Smothers on the other side of the restaurant." *See* Myvett Opp., Dkt. 86, at 5. Myvett does not claim that these witnesses were undisclosed, however, only that the defendants misrepresented their statements as inculpatory, when depositions later demonstrated that their statements were exculpatory. *See* Dkt. 69-14 (Corbello Dep.) at 104-05; Dkt. 69-2 (Allen Dep.) at 65, 140-41, 147, 149-50. Myvett points to no "existing piece of evidence" that the defendants withheld regarding these witnesses. *See Saunders-El*, 778 F.3d at 562 (*Brady* claim requires failure to disclose "existing piece of *evidence* to the prosecution"). But again, "*Brady* does not require the creation of exculpatory evidence," and therefore does not require the police to generate reports reflecting "truthful versions of statements made during interrogations." *Id.* Thus, while Myvett may probe these facts when attempting to establish that the defendants falsified the witness identifications in their reports, he has no *Brady* claim for their failure to generate reports that were exculpatory.

The same is true of Myvett's claim that the defendants mischaracterized the White Castle video as having "few usable images," and thereby failed to disclose "the import of the content of the surveillance video in violation of *Brady*." Myvett Mem., Dkt. 75, at 2, 14. Even Myvett concedes that he "has never claimed the video itself was hidden or otherwise suppressed in the criminal case." Myvett Reply, Dkt. 94, at 4. Instead, Myvett argues that, "despite the exculpatory nature of the video – that it directly contradicted the police accounts of Corbello and Barry, this video was falsely characterized by the Defendant Detectives as having 'few usable images.'" *Id.* at 4-5. Here again, the Seventh Circuit has rejected such a *Brady* theory. *See Beaman v. Freesmeyer*, 776 F.3d 500, 511-12 (7th Cir. 2015) (rejecting *Brady* claim based on "deceptive police report" because "police generally discharge their *Brady* duty by turning over exculpatory evidence to the prosecutor"). Since Myvett makes no claim "that the video was hidden or otherwise suppressed," his *Brady* claim based on the video also fails.

C.      **The Parties' Factual Arguments**

The parties' remaining arguments regarding Myvett's due process claim raise factual disputes precluding summary judgment in favor of either side, except in one respect—Myvett has failed to adduce sufficient evidence against Officer Kalfas to support Myvett's due process claim (or, as explained below, his conspiracy claim). As noted above, Officer Kalfas's only role in Myvett's evidence fabrication claim was attesting to the arrest report, which incorrectly stated that Myvett was "positively identified" as the shooter. *See* Myvett Mem., Dkt. 75, at 5. But as also noted above, it is unclear whether Officer Kalfas or Officer Ghorbanian prepared this report, *see* Myvett Resp. to Def. SOF, Dkt. 82, ¶ 42; and it is undisputed that Kalfas was "not even present at the White Castle for the show up," Myvett Opp., Dkt. 86, at 13, and did not interview "any of the witnesses to the White Castle incident." Myvett Resp. to Def. SOF, Dkt. 82, ¶ 44. Nor is it disputed that the incorrect information in the arrest report was provided "by other police

officers." *Id*. at ¶ 43; Def. Mem., Dkt. 67, at 3; Def. Reply, Dkt. 88, at 4. Kalfas thus asserts that "he had no firsthand knowledge" of this information, and that there "is no evidence in the record" that he "knew or had any reason to know the information in the report was not correct." Def. Reply, Dkt. 88, at 4, 10.

Myvett nevertheless argues that Kalfas (along with all of the other defendants) "knew that no witness had identified Plaintiff as the actual shooter," yet Kalfas swore to an arrest report saying that Myvett had been identified as such. Myvett Mem., Dkt. 75, at 5. But Myvett's only support for his assertion that Kalfas had such contrary knowledge is that Kalfas "was present at the 20th District during the investigation." *Id*. That is no substitute for evidence that Kalfas knew the statements in the report were false. Nor is this conclusion altered by Myvett's repetition of the fact that Kalfas attested to the report "under penalty of perjury." *Id*.; Dkt. 69, ¶ 45; Dkt. 86 at 4. Kalfas declared only that the facts in the report were accurate to the best of his "knowledge, information, and/or belief," Dkt. 69-6, at 5, and Myvett has failed to show that Kalfas had any contrary "knowledge, information, and/or belief." After all, it is undisputed that Kalfas was not at the show-up and did not interview any witnesses, and thus ***could not have*** any contrary firsthand knowledge. Officer Kalfas's motion for summary judgment on Myvett's due process claim (Count II) is therefore granted.[5]

As to the remaining defendants, there are disputed issues of material fact relating to the question of whether the officers intentionally fabricated evidence (in contradistinction to creating reports and testimony that were inaccurate, but not intentionally so).

Beginning with the investigators assigned to the case, Officers Heerdt and Almdale, the record supports Myvett's claim that within hours of his arrest, the victim (Allen) told Heerdt and Almdale that he was "100% certain that Jackson had control of the gun and that Jackson is the man who shot him." Myvett SOF, Dkt. 69, ¶¶ 16, 52 and Ex. K, Dkt. 69-12, at 23. It is undisputed, moreover, that Heerdt recovered and reviewed the White Castle surveillance video before interviewing witnesses on the night of the incident, Def. Resp. to Myvett SOF, Dkt. 81, ¶ 23, and that any witness accounts "of Myvett pulling a gun were inconsistent with the video" because it "showed that Myvett was outside the restaurant when someone on the east side of the restaurant pulled a gun out," causing those witnesses "to flee from the restaurant." *Id*. at ¶¶ 24-26, 28, 30. Yet, after Heerdt viewed this video (and this, too, is undisputed), Almdale prepared a Felony 101 form, "a document that is used to communicate with the assistant State's Attorneys," incorrectly stating that "Demetrius Barry and Martin Corbello observed Myvett pull a dark colored revolver from his waistband and wave the weapon in the air," although the video does not show this, and all parties agree that the witnesses could not have seen it. *Id*. at ¶¶ 24-26, 28,

---

[5] Myvett asserts that the defendants' response to his summary judgment motion "does not address any factual circumstances or arguments regarding the Plaintiff's Motion for Summary Judgment on due process grounds against Defendants Kalfas or Barker," and therefore requests that his motion "be granted as to those two defendants." Myvett Reply, Dkt. 94, at 4 n.2. But this argument overlooks that those defendants cross moved for summary judgment on Myvett's due process claim, and thus presented their arguments and factual assertions in connection with that motion, *see* Dkts. 67-68, several of which Myvett did not dispute. *See*, *e.g.*, Myvett Resp. to Def. SOF, Dkt. 82, ¶¶ 30; 42-44, 47-48.

30, 67-68. The next day, the state's attorney incorrectly represented to the bond court judge that Myvett was the shooter in the incident, and Myvett was thereafter held in maximum security at Cook County for the next thirteen months pending trial. *Id*. at ¶ 73; Dkt. 69-20.

The record also shows that Officers Heerdt and Almdale discussed the contradictions between the witness accounts they claim to have obtained and the White Castle video within a day of the incident, and thus before Almdale completed his report and the case was presented to the grand jury. *Id*. at ¶¶ 29-30, and Ex. G, Dkt. 80-7, at 175-76. Yet Almdale's report included statements by Corbello (which all parties again agree are inconsistent with the video) that "Myvett pulled out the gun" and "Myvett and Jackson struggled for control of the gun." Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 24-26, 28, 30, 34. Almdale's report also included statements by the victim (Allen) that Myvett attacked him, fought with him, and struggled for the gun, Myvett SOF, Dkt. 69, ¶¶ 54-65, which Allen later denied making, *id*. at ¶¶ 54, 58, and by Carla Huffman that "both Jackson and Myvett started punching Allen" and "Allen traded punches with Jackson and Myvett," *id*. at ¶¶ 38-40, which Huffman evidently did not make. *Id*. at ¶ 39. The record also supports Myvett's claim that Heerdt's grand jury testimony that various witnesses, including Smothers and Thompson, placed Myvett as "struggling to maintain the weapon in an attempt to shoot Mr. Allen," and thus "participated in the shooting by trying to maintain control of the gun," likewise lacked support. *See* Myvett SOF Ex. Q, Dkt. 69-18 at 6-7; Myvett SOF Ex. J., Dkt. 69-11, at 75-77, 136, 180-81; Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 70-72.

Officer Heerdt admits that Smothers and Thompson "did not in fact give this evidence," but responds that there "were witnesses who informed the detectives and the police that the Plaintiff had a gun," and "Detective Heerdt may have been confused regarding the names of the witnesses." Def. Opp., Dkt. 80, at 9. In this regard, both Heerdt and Almdale argue that Corbello and Barry had stated that "the man with the dreadlocks," whom "the officers reasonably believed to be the Plaintiff, pulled out the gun in the White Castle." *Id*. at 8-9. The defendants concede, however, that it "became clear during Corbello's deposition that he could not have seen Myvett take out the gun," but claim that "this was nonetheless his memory." Def. Reply, Dkt. 88, at 6. It is likewise undisputed that Barry also could not have seen Myvett pull a gun, since Myvett was outside the restaurant when the gun was pulled and Barry fled. *See* Myvett Reply, Dkt. 94, at 4; Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 24-26, 30; Def. Reply to Myvett SOAF, Dkt. 90, ¶ 11. Nevertheless, like Heerdt, Almdale argues that "he may have attributed witness statements to witnesses that were not necessarily accurate," but "at the time that he compiled the evidence, Detective Almdale believed the evidence to be true." Def. Opp., Dkt. 80, at 9. Almdale and Heerdt thus concede that "the investigation was not without flaws," but argue that "the sort of inconsistencies to which the Plaintiff points are normal." *Id*. at 10 (brackets omitted, quoting *Askew v. City of Chicago*, 440 F.3d 894, 896-87 (7th Cir. 2006)).

To the extent the defendants imply that the myriad errors infecting their reports are tolerable because "inconsistencies" are to be expected in the initial reports generated in the wake of a shooting involving numerous parties and witnesses, they seek the cover of a reasonable proposition that is inadequate to shelter what can be described, at best, as police work that was unacceptably shoddy. The point here, however, is that it is possible, and not unreasonable, to describe the police work here only as "shoddy" and not as intentionally so. The argument as to which characterization best fits the evidence in this case is for a jury to decide, and *Askew v. City of Chicago*, on which the defendants rely, explains why. Unlike the minor discrepancies at issue

in *Askew*, the challenged witness statements here were material, indeed central, to the decisions to charge and prosecute Myvett. *See id*. at 896 ("If these subjects were material, then there would be work for a jury to do."); *Norris v. Ferro*, No. 06 C 2793, 2009 WL 1033557, *5 (N.D. Ill. Apr. 17, 2009) (noting *Askew's* statement that "material" inconsistencies create jury questions, and denying summary judgment on false arrest claim where questions regarding defendant officer's "credibility" were "so substantial that at the summary judgment stage," the court could not "accept *any* of his testimony regarding what he knew and when"); *Patterson*, 2012 WL 5381328, *4 ("Patterson indicates that he will offer testimony at trial regarding the falsity of the statements made by the arresting officers in their reports, which if believed by the trier of fact would constitute circumstantial evidence showing that the arresting officers fabricated evidence against Patterson."). Heerdt's and Almdale's motion for summary judgment on Myvett's due process claim is therefore denied. Conversely, as to Myvett's arguments, it is likewise for a jury to decide whether these officers fabricated out of whole cloth the witness identifications of Myvett as the shooter or struggling for the gun—having interviewed those witnesses and been aware of the surveillance video that contradicted at least some of their accounts—or rather, as the officers maintain, innocently misconstrued contrary witness statements, misattributed statements to the wrong witnesses, or such statements unraveled for other reasons. Simply put, there is "work for a jury to do." *Askew*, 440 F.3d at 896. Myvett's motion for summary judgment on his due process claim against Heerdt and Almdale is therefore denied as well.

The parties' motions for summary judgment on Myvett's due process claim against Officer Barker are denied for the same reason. Although some of the facts surrounding Barker's involvement in the investigation are undisputed, the critical facts regarding whether Barker "knew that no witness had identified Plaintiff as the shooter and therefore knowingly approved a false report," Def. Reply, Dkt. 88, at 11, are hotly contested. Taking first what is undisputed, the parties agree that the show-up identification procedure at the White Castle on the night of the incident "was initiated, run and supervised by" Barker. Def. Resp. to Myvett SOF, Dkt. 81, ¶ 12; that Barker "spoke to all of the witnesses during the show-up to determine whether Myvett and Jackson were involved in the incident," *id*.; and that Barker "told Detective Almdale that the witnesses did not identify Paul Myvett or Wilbur Jackson as firing the gun at Reginald Allen, but rather, only as being involved in the fight that preceded the shooting." *Id*. at ¶ 17. Yet Barker approved a case incident report stating that unnamed witnesses had identified Myvett as the shooter, *id*. at ¶ 47, both to the responding officers *and* at the subsequent show-up which Barker admits to conducting. *See* Myvett Ex. O, Dkt. 69-16, at 4 (Myvett and Jackson "were detained and taken back to the scene for a show up *at which time* offender Myvett *was positively identified* at 0251 hours by witnesses as the offender who displayed a handgun and shot the victim in the left leg." (emphasis added)); Def. Ex. J, Dkt. 80-10, at 5 (same).

Barker nevertheless argues that it was "Defendants Heerdt and Almdale, not Defendant Barker, who interviewed the witnesses at the police station and memorialized the witness statements," and that Barker's "limited interaction with the witnesses" is insufficient to demonstrate that he "knew that no witness had identified Plaintiff as the shooter and therefore knowingly approved a false report." Def. Reply, Dkt. 88, at 11. But the case incident report that Barker approved indicates that witnesses identified Myvett as the shooter to the responding officers *and at the show-up which Barker conducted*, not at the police station when Heerdt and Almdale later interviewed the witnesses. *See* Myvett Ex. O, Dkt. 69-16, at 4; Def. Ex. J, Dkt. 80-10, at 5. Barker also attempts to neutralize the inconsistent statements he admittedly obtained at

the show-up (identifying Myvett and Jackson "only as being involved in the fight that preceded the shooting," Dkt. 81, ¶ 17) by explaining that he had not asked the witnesses at the show-up to identify the shooter, only whether Myvett and Jackson "had been involved in the incident." Def. Reply, Dkt. 88, at 11; Def. Reply to Myvett Resp. to SOF, Dkt. 90, ¶ 29. But according to Myvett, that is precisely the problem. Myvett argues that Barker conducted the show-up "in a manner that permitted him and other officers to create false identifications of Plaintiff as the shooter," by asking "the deliberately obtuse question of whether either of the suspects was involved in the incident" (instead of "attempting to ascertain who fired the shot at Allen"), and then failing to "document any of the responses or circumstances surrounding the show-up." Myvett Mem., Dkt. 75, at 9. Per Myvett, this "intentionally vague show-up procedure" "spawned" the inaccurate case incident report Barker later approved, and the inaccurate arrest report to which Kalfas attested, Myvett Mem., Dkt. 75, at 8; Myvett Opp., Dkt. 86, at 7, both of which were then provided to the felony review state's attorney who approved the charges against Myvett. *See* Myvett Resp. to Def. SOF, Dkt. 82, ¶ 48, and Def. Reply thereto, Dkt. 90 ¶ 48.

There are similar disputes regarding Barker's alternative basis for the incorrect statements in the case incident report he approved—testimony by Officer White (who originally submitted this report) "that Corbello told him that the person who pulled out the gun was a male black wearing a black shirt with dreadlocks," which fit Myvett's description. Def. Resp. to Myvett's SOF, Dkt. 81, ¶ 49. Myvett challenges this explanation, since it is undisputed that any such account is inconsistent with the White Castle video, Myvett Reply, Dkt. 94, at 4; indeed, as noted above, all defendants have conceded that Corbello "could not have seen Myvett take out the gun." Def. Reply, Dkt. 88, at 6. Conversely, Barker disputes Myvett's claim that Barker, as the officer interacting with the witnesses at the show-up, knew of Barry's account that the gunman was wearing a "torn puffy coat" (which Jackson, not Myvett, was wearing), because Barry testified that he would have given this "distinct detail" to the police at the show-up. Myvett Opp., Dkt. 86, at 4, 14; Myvett Reply, Dkt. 94, at 8. Here, however, it is Barker who complains that the "leading questioning" of Barry by Myvett's counsel was obtuse, because it elicited only whether Barry "would have" given that information to the police, not whether he did so. Def. Reply, Dkt. 88, at 7. Barker argues that when "asked directly whether he gave a description of the person with the gun," Barry "could not remember one way or the other." *Id.*

Viewing both side's motions in the light most favorable to the opposing party, the Court concludes that there are disputed issues of fact regarding whether Barker "knew that no witness had identified Plaintiff as the shooter and therefore knowingly approved a false report." *See* Def. Reply, Dkt. 88, at 11. While Barker's role in the investigation was more limited than Heerdt's and Almdale's, it was hardly inconsequential, and the incorrect statements in the case incident report he approved—that unnamed witnesses had "positively identified" Myvett as the offender who shot Allen (Dkt. 69-16, at 4; Dkt. 80-10, at 5)—which were then provided to the felony review state's attorney who approved the charges against Myvett (Dkt. 90, ¶ 48), are not the sort of immaterial inconsistencies that *Askew* directs the Court to overlook. Nor can it be said that Barker is unaccountable for these statements merely because Heerdt and Almdale interviewed the witnesses after Barker spoke to them and White initially submitted the case incident report. Regardless of any statements that other officers may have obtained earlier or later (all of which are hotly disputed), Barker had reason to question the case incident report's assertions that unnamed witnesses had identified Myvett as the shooter to responding officers and at the subsequent show-up that Barker himself conducted, when Barker was unaware of any such

witnesses and had received different information at his own show-up. *See* Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 12, 17, 50. The parties' cross motions on Myvett's due process claim against Officer Barker thus create more "work for a jury to do," *Askew*, 440 F.3d at 896, and are therefore denied as well.

## II.    Conspiracy Claim (Count III)

The parties next seek summary judgment on Myvett's conspiracy claim (Count III). Myvett seeks summary judgment on this claim as to all defendants, Myvett Mot., Dkt. 71, ¶ 2; and the defendants seek summary judgment on this claim as to Officers Barker and Kalfas. *See* Def. Reply, Dkt. 88, at n.1. As with Myvett's due process claim, the parties' summary judgment arguments on Myvett's conspiracy claim are thwarted by factual issues, except (again) as to Officer Kalfas.[6]

"To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman*, 776 F.3d at 510-11. "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, **but such evidence cannot be speculative**." *Id.* (emphasis added). Kalfas challenges both elements of Myvett's conspiracy claim. He argues that Myvett has no evidence that Kalfas "formulated any agreement" with the other defendants "to deprive Plaintiff of his due process rights," Def. Mem., Dkt. 67, at 13; and that Kalfas's arrest report incorrectly stating that Myvett was identified as the person who shot Allen fails to constitute an "overt act in furtherance of the conspiracy," because that information was "given to him by other officers," and there is no evidence that Kalfas "knew or had any reason to know that the information given to him was false." Def. Reply, Dkt. 88, at 10.

Myvett's only retort is to point to "the coordinated 'investigation' in this case," which initially made him out to be the shooter and then "transformed" him "into the accomplice." Myvett Reply, Dkt. 94, at 13. But Myvett himself makes the case that Kalfas did not participate in this "coordinated investigation." As Myvett concedes, "Kalfas was not even present at the White Castle for the show up," Myvett Opp., Dkt. 86, at 13, and did not interview "any of the witnesses to the White Castle incident." Myvett Resp. to Def. SOF, Dkt. 82, ¶ 44. Myvett thus lacks evidence of any overt act by Kalfas in furtherance of a conspiracy. And while circumstantial evidence of a conspiratorial agreement might suffice, Myvett has failed to identify

---

[6] The defendants initially argued in their Memorandum that Myvett's conspiracy claim fails "as a matter of law" because it is not "an independent basis of liability," Def. Mem., Dkt. 67, at 11, but withdrew that argument in their Reply. *See* Dkt. 88 at 9. In so doing, the defendants have apparently abandoned the other legal theory asserted in their opening Memorandum, but similarly omitted from their Reply, that Myvett's conspiracy claim fails "because he has alleged no injury beyond the underlying tort that the Defendant officers allegedly conspired to commit." *See* Dkt. 67 at 11. Nevertheless, waived or not, the Court rejects this latter argument. As the defendants' authority for the point demonstrates, there is "evidentiary use" for a conspiracy claim, as well as "spreading the net of liability to additional persons," and the potential for harm inflicted through a conspiracy "conceivably not tortious in itself." *Niehus v. Liberio*, 973 F.2d 526, 531-32 (7th Cir. 1992). Myvett's conspiracy claim here survives for these reasons.

any suggestion that Kalfas "knew or had any reason to know that the information given to him was false." Def. Reply, Dkt. 88, at 10. So there are no circumstances from which a conspiratorial agreement involving Kalfas could be reasonably inferred. Officer Kalfas's motion for summary judgment on Myvett's conspiracy claim is therefore granted.

As to the remaining defendants (Heerdt, Almdale, and Barker), the parties' cross motions on Myvett's conspiracy claim raise disputed issues of material fact. As explained above in connection with Myvett's due process claim, there is evidence to support a verdict that Officers Heerdt and Almdale fabricated evidence in violation of Myvett's due process rights. *See supra* section I, C. That they investigated the case together and discussed the inconsistencies between the witness identifications they claim to have received and the White Castle surveillance video, *see* Def. Resp. to Myvett SOF, Dkt. 81, ¶ 29, is also circumstantial evidence of a conspiratorial agreement. *See Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, *10 (N.D. Ill. Feb. 6 2014) (denying summary judgment on conspiracy claim alleging multiple officers involved in an effort to frame plaintiff: "the involvement of different witnesses who dealt with a group of defendants who were co-workers, are unusual enough that a jury could reasonably conclude that the defendants acted in concert and that these were not independent actions"). The same is true of Officer Barker, who "spoke to all of the witnesses during the show-up," told Officer Almdale that those witnesses identified Myvett "only as being involved in the fight that preceded the shooting," and then approved a case incident report that instead included incorrect and unattributed witness identifications of Myvett *as* the shooter. Dkt. 81 at ¶ 12, 17, 47. This, too, provides circumstantial evidence of a conspiratorial agreement with the other defendants and an overt act in furtherance of it. *See Fields*, 2014 WL 477394, at *10. Officer Barker's motion for summary judgment on Myvett's conspiracy claim is therefore denied.[7]

But still, the question is for a jury. Although Myvett has adduced evidence from which a jury could infer a conspiracy between Heerdt, Almdale, and Barker to fabricate witness statements against him, Myvett "has not proven at this point that the statements were false, and even if they were false there are other possible explanations." *See Fields*, 2014 WL 477394, at *10 (denying summary judgment on § 1983 conspiracy claim). Myvett's motion on his conspiracy claim against these officers is therefore denied as well (as is Myvett's motion on this claim against Officer Kalfas, as explained above).

## III. Malicious Prosecution Claim (Count IV)

Finally, Myvett seeks summary judgment on his state malicious prosecution claim against Officers Heerdt and Almdale. *See* Myvett Mot., Dkt. 71, ¶ 3.[8] And again, the motion is mired in

---

[7] The defendants' opening Memorandum also argued for summary judgment as to Officer Barker "to the extent" Myvett's claims premised Barker's liability on the fact that he was "the supervisor on duty during the shooting investigation." Def. Mem., Dkt. 67, at 16. And once again, this argument was omitted from their Reply. In any case, the Court does not understand Myvett's claims against Officer Barker to be premised upon his supervisory role, nor does the Court base its conclusions herein on that role.

[8] As noted above, Officers Barker and Kalfas originally sought summary judgment on Myvett's malicious prosecution claim, *see* Dkt. 65, ¶ 4, after which Myvett voluntarily dismissed that claim against those defendants. *See supra* note 1; Dkts. 77, 79. To the extent Officers Barker

factual disputes. A claim for malicious prosecution under Illinois law requires (1) that the defendants commenced or continued judicial proceedings, (2) without probable cause, (3) with malice, (4) terminated in Myvett's favor, and (5) injury. *Saunders-El*, 778 F.3d at 561. Officers Heerdt and Almdale argue that there are factual disputes here regarding the first three of these elements. Def. Opp., Dkt. 80, at 13-14. The Court agrees, largely because the question of whether the officers intentionally lied in their reports is, for the reasons discussed above, a question for the jury.

As to the first element—commencement or continuation of proceedings—the record shows that Almdale prepared a Felony 101 form and a case report, both of which were to provide information to the state's attorney's office. *See* Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 67, 69. The record also shows that Heerdt interviewed Allen with Almdale, viewed and discussed the video with Almdale, spoke with both offenders and their friends (Cameron and Smothers), and prepared annual progress reports regarding those interviews. *Id*. at ¶¶ 19, 23, 29, 44, 52, 71. And the record also shows that Heerdt and Almdale both had contact with the state's attorney. *See* Def. Ex. G (Almdale Dep.), Dkt. 80-7, at 209-10; Myvett Ex. J (Heerdt Dep.), Dkt. 69-11, at 101. Still, while these facts are sufficient to create a jury question, they do not show conclusively that the officers played the "significant role in causing the prosecution of the plaintiff" that is required for an Illinois malicious prosecution claim, such as exerting "improper influence" on, or making "knowing misstatements" to, the prosecutor. *See Davis v. Feinmore*, No. 09 CV 939, 2010 WL 1489988, *4 (N.D. Ill. Apr. 13, 2010) (quoting *Frye v. O'Neil*, 166 Ill. App. 3d 963, 975, 520 N.E.2d 1233, 1240 (4th Dist. 1988)); *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 348-48, 733 N.E.2d 835, 842 (1st Dist. 2000) (malicious prosecution requires "a significant role in causing the prosecution of the plaintiff"). In short, whether Heerdt and Almdale exerted such improper influence or made such knowing misstatements is genuinely disputed. *See Anderson v. Landrum*, No. 1:12-cv-01902, 2015 WL 1538243, *8-9 (N.D. Ill. Mar. 31, 2015) (jury "reasonably could have concluded that the Defendant Officers lied in their arrest reports and case reports when they knew those reports would be sent to the state's attorney," which is "enough for a jury to conclude that [defendant was] liable for commencing the criminal proceedings against [plaintiff].").[9]

Regarding the second element of probable cause, Heerdt and Almdale argue that they "had probable cause to arrest Plaintiff based on information known to them at the time through police radio transmissions, witness statements, witness identifications and the White Castle video." Def. Opp., Dkt. 80, at 13. But for purposes of a malicious prosecution claim, "the pertinent time for making the probable cause determination is the time when the charging document is filed, rather than the time of the arrest." *Holland v. City of Chicago*, 643 F.3d 248, 254 (7th Cir. 2011). Thus, while radio transmissions and initial witness statements may have provided probable cause for Myvett's arrest, there is also evidence calling into question whether

---

and Kalfas mistakenly continue to seek summary judgment on this claim following that dismissal, *see* Def. Reply, Dkt. 88, at 11, their motion is denied as moot.

[9] The question of whether the reports were intentionally falsified goes also to the element of malice, creating an additional fact dispute as to that element as well, in addition to those discussed below.

there was probable cause for the charges of attempted murder and aggravated battery with a firearm later brought against him. *See* Dkt. 82, ¶ 49. Specifically, the victim had already insisted that Myvett did not shoot him, *see* Myvett Ex. K, Dkt. 69-12, at 22-23, and the video evidence contradicted any other witness accounts that Myvett pulled a gun or shot Allen. *See* Def. Resp. to Myvett SOF, Dkt. 81, ¶¶ 24-26, 28, 30. But still, while these facts count in the probable cause analysis, *Fox v. Hayes*, 600 F.3d 819, 834 (7th Cir. 2010) (probable cause standard does not "allow the defendants to rely on facts without regard to the full context of the circumstances known to them"), the probable cause standard is "generous." *Anderson*, 2015 WL 1538243, at *8. An Officer "is not required to verify the correctness of each item of information obtained; it is sufficient to act with reasonable prudence and caution." *Kim v. City of Chi.*, 368 Ill. App. 3d 648, 654-55, 858 N.E.2d 569, 574-75 (1st Dist. 2006). And "an honest belief" that "the accused is probably guilty of the offense" will suffice, despite "a mistake or error that is not grossly negligent." *Id*. Thus, where the officers' bases for probable cause are hotly disputed by both sides (as here), the question is once again for a jury. *Anderson*, 2015 WL 1538243, at *8 ("the jury may reasonably have found that the officers did not have probable cause for the prosecution" and "the usually generous probable cause standard 'does not trump our duty to defer to a jury's findings'" (quoting *Fox*, 600 F.3d at 834).

Lastly, regarding the third element of malice, Heerdt and Almdale deny malice and contend that the record lacks "any indication of any action taken or word spoken by Defendants that would indicate any malice in initiating or continuing the criminal proceeding against Plaintiff." Def. Opp., Dkt. 80, at 14. Myvett answers that malice may be "inferred from the lack of probable cause if there is no evidence that refutes that inference." Myvett Mem., Dkt. 75, at 18 (citing *Fabiano v. Palos Hills*, 336 Ill. App. 3d 635, 647, 784 N.E.2d 258, 270 (1st Dist. 2002)). But while that is true, the argument demonstrates yet another jury question requiring denial of Myvett's motion, since any such inference is for the factfinder (not the Court) to draw. *See Williams v. City of Chicago*, 733 F.3d 749, 760 (7th Cir. 2013) ("a jury can infer malice from an absence of probable cause"); *Fabiano*, 336 Ill. App. 3d at 647, 784 N.E.2d at 270 ("a trier of fact may infer malice from lack of probable cause if there is no credible evidence which refutes that inference"). Thus, while "evidence that would *permit* a finding of no probable cause and *permit* a reasonable inference of malice" is sufficient to defeat summary judgment *against* a plaintiff, *Williams*, 733 F.3d at 760 (emphasis in original), such evidence does not "clearly prove" a lack of probable cause or "require the court to infer malice," as would be necessary to grant summary judgment *in favor* of the plaintiff. *See id*. (evidence that would "permit a finding of no probable cause," rather than "'clearly prove' the lack of probable cause," sufficient to defeat summary judgment). In this case, therefore, the same evidence that raises a jury question as to whether Heerdt and Almdale had probable cause for the charges ultimately brought against Myvett also raises a jury question regarding the element of malice.[10] And because fact questions thus exist regarding the first three elements of Myvett's malicious prosecution claim against Heerdt and Almdale, Myvett's motion for summary judgment on this claim is denied, as well.

---

[10] The record also includes other evidence from which malice could be inferred, including the facts that at least Officer Heerdt recognized Myvett from his work on "other aggravated batteries," that Myvett was not "unknown to the Police," and that Heerdt discussed these facts with Almdale. *See* Def. Resp. to Myvett SOF, Dkt. 81, ¶ 23; Myvett Ex. B, Dkt. 69-3, at 34-37. Here again, however, any such inference is for a jury to draw.

\*     \*     \*

For all of the foregoing reasons, Myvett's Motion for Partial Summary Judgment, Dkt. 71, is denied in its entirety; and the defendants' Motion for Partial Summary Judgment, Dkt. 65, is granted as to Officer Kalfas only, and otherwise denied.

Date: May 28, 2015

John J. Tharp, Jr.
United States District Judge