# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| PAUL MYVETT, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 12 CV 09464 |
| | ) | |
| CHICAGO POLICE DETECTIVE EDWARD | ) | Judge John J. Tharp, Jr. |
| HEERDT, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In the early morning hours of November 27, 2010, Plaintiff Paul Myvett was arrested for allegedly shooting Reginald Allen during a late night fracas at a White Castle restaurant on the north side of Chicago. The charges levied against Myvett based on that shooting, however, were unfounded; Allen told police within hours of the shooting, and before Myvett was charged, that Myvett was ***not*** the shooter. At trial, Myvett was acquitted of the charges; the state court trial judge granted Myvett's motion for a directed verdict at the close of the prosecution's case in chief. But that was only after Myvett had been detained for thirteen months, a deprivation of liberty he attributed to the false information provided by investigating officers to the prosecutor before his bond hearing.

After his acquittal, Myvett filed claims under 42 U.S.C. § 1983 against Chicago Police Detectives Edward Heerdt, Lloyd Almdale, and Chicago Police Sergeant Patrick Barker, alleging that they denied him due process of law by fabricating witness statements that implicated him in

the shooting of Reginald Allen.[1] Myvett also alleged the defendants engaged in a malicious prosecution in violation of Illinois state law.

After a two-week jury trial, the jury returned a verdict in favor of Sergeant Barker on all counts. They found against both Detective Heerdt and Detective Almdale on the malicious prosecution claim and found against Detective Almdale on the fabrication of evidence due process claim. The jury awarded Myvett a total of $300,000 in compensatory damages ($100,000 as to Heerdt on the malicious prosecution count; $100,000 on each of the two claims against Almdale). Almdale and Heerdt now move pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on their respective counts of liability. For the reasons stated below, the defendants' motion is denied.

## BACKROUND[2]

During the evening of November 26, 2010, after eating dinner with his longtime girlfriend and two daughters, Myvett went out to a party in the Uptown neighborhood where he had grown up. After socializing for a while, Myvett decided to head home. On his way out, he encountered a childhood friend, Wilbur Jackson, arriving at the party. The two had not seen each other in a long time. Myvett told Jackson he was heading to a White Castle for a bite to eat and Jackson asked if he could come along. The pair got into Myvett's car (which he had borrowed from his girlfriend) and drove to a nearby White Castle restaurant located at 5940 North Ridge Avenue in Chicago.

---

[1] Myvett also named Chicago police officer George Kalfas as a defendant in the case but the claims against Kalfas were dismissed on summary judgment. *See* Order ECF No. 96.

[2] In addressing a motion pursuant to Rule 50(b), the evidence must be construed in the light most favorable to Myvett. *Ekstrand v. School Dist. of Somerset*, 683 F.3d 826, 828 (7th Cir. 2012).

When they arrived at the White Castle, Myvett walked inside to place his order while Jackson remained outside to take a phone call. Myvett parsed through the menu and placed his order. Myvett did not see Jackson enter the restaurant but, as he was waiting for his order to be delivered to the pickup counter, Myvett looked towards the other (east) side of the restaurant and observed Jackson trying to get to the counter through a late night crowd of rowdy patrons.

While Myvett waited for his meal, a fight broke out inside the restaurant. During the melee, someone struck Myvett (this individual was later identified as Brian Smothers). After the two struggled for a few moments, Myvett and Smothers separated. Video from two surveillance cameras in the restaurant established that Myvett remained on the restaurant's west side during these events. Then, thinking that Jackson had left the restaurant, Myvett proceeded outside the White Castle to look for him.

Martin Corbello was another customer in the restaurant when the fight broke out. Corbello testified that in the early morning hours of November 27, 2010, he joined a couple of friends—Demetrius Barry and Carla Huffman—at the White Castle for a post-bar bite to eat. After ordering some food, Corbello and friends took seats at a counter running along the windows on the east side of the restaurant. Shortly thereafter, Corbello testified, the entire restaurant seemed to erupt into a brawl. Three individuals in the brawl moved toward the east side of the restaurant, past a soda machine, and toward the counter where Corbello and his friends were eating, and actually fell onto the counter. One of the individuals (later identified as Wilbur Jackson) involved in the brawl—who was wearing a torn brown puffy coat and was bleeding from the side of his mouth—pulled out a gun and the trio began fighting for control of the gun. Seeing the gun, Corbello and his friends managed to slip past the brawlers and then fled

out the front door along with just about everyone else who had been inside the restaurant. Corbello and friends retreated to their car that was parked on the west side of the restaurant.

Surveillance video established that by the time the altercation at the soda machine was taking place on the east side of the restaurant and the gun allegedly had been brandished (the gun cannot be seen on the video, but testimony of Corbello and others established that the appearance of the gun triggered the exodus from the restaurant), Myvett had already left the White Castle. Myvett testified, consistent with the video, that he left the restaurant to look for Jackson and that, unable to locate Jackson outside, he went back into the restaurant to look for him. He then, for the first time that night, walked toward the east side of the restaurant (where the soda machine is located) and found Jackson and an individual later identified as Reginald Allen wrestling in the northeast corner of the restaurant. Myvett bent down towards Jackson, at which time a gunshot can be heard on the video recording. Myvett then helped Jackson up, thinking he may have been wounded, and the two quickly left the restaurant. A number of witnesses testified that a second shot was fired, but others, including Myvett and Corbello, did not recall hearing a second shot.

As Myvett and Jackson were leaving, they walked directly in front of the parked car to which Martin Corbello and his friends had retreated. As they passed in front of the car, Corbello saw the man who had pulled the gun out during the fight (that is, Jackson) wearing the torn, puffy jacket. Corbello heard Myvett tell Jackson "to be cool" as the pair entered the car parked next to them (Myvett on the driver's side, Jackson on the passenger's side). Myvett explained on his direct examination that he made this comment because Jackson had a deep laceration on the corner of his mouth and appeared disoriented. Once Myvett and Jackson drove off, Corbello tried to call 911 but was unable to connect until police had already arrived on the scene.

Thinking that Jackson could have been shot, Myvett drove Jackson towards Weiss Memorial Hospital, located on Marine Drive in Chicago. On the way, he ran a traffic light and a police patrol vehicle promptly pulled him over. Because their license plate matched the number Corbello had provided, the police officers who stopped the car took Myvett and Jackson into custody and searched them; they did not find any weapons on their persons or inside the car.[3] The patrol officers then drove them back to the White Castle. Jackson was wearing, among other items, a torn brown puffy jacket and sneakers with red shoe laces.

In the meantime, police had arrived at the White Castle. Officers Bryant Garcia and Scott White were the first to arrive. Garcia spoke to Corbello, as well as Cameron Thompson and Brian Smothers, who were assisting Allen when the officers arrived. Based on the information they provided, Garcia issued the following radio flash message:

> 2054 for an update. . . . There's a few witnesses that are stating that, uh, it was a 4-door light grey color, uh, sedan, with the license plate of King 731322, uh fled in an unknown direction. The driver, uh, the shooter is a male black, light, er, or dark-skinned. 5'9", approximately 190 lbs. Dreads, shoulder-length, full beard and mustache. And his coat is all shredded up from the fight. And he's armed with a revolver, black.

Def. Ex. 10.1g.wav. This description is the pivotal fact of this case because it combined characteristics of the two men Corbello observed: Myvett indisputably wore shoulder-length dreadlocks at the time and Jackson indisputably was wearing a shredded brown coat when he was arrested.[4] All of the subsequent errors in the investigation and prosecution of Myvett arose from this initial conflation of characteristics of Myvett and Jackson that evening.

---

[3] No firearm was recovered at the White Castle restaurant, either.

[4] Jackson wore cornrows, not dreadlocks, and his cornrows did not extend to his shoulders. See Def. Ex. 9, FCRL000142-143. At trial, the parties largely focused on these two elements of the description of the shooter (along with Allen's subsequent statement that the shooter was wearing shoes with red laces, which were recovered from Jackson). The other

Once Myvett and Jackson arrived back at the restaurant, the senior officer at the scene, Sergeant Barker, directed Corbello and his friends back inside the White Castle. Jackson and Myvett were removed from the patrol car and stood facing the east windows of the restaurant at some distance (estimates varied). Barker asked Corbello if he recognized the men. Corbello identified both Myvett and Jackson as having been involved in the fight that originated near the soda machine and ultimately moved to the location where Corbello and friends had been eating.[5] On direct examination, Corbello testified that during this procedure he specifically identified the man wearing a torn puffy jacket and bleeding from the mouth—that is, Wilbur Jackson—as the individual who brandished the firearm inside the restaurant. On cross-examination, however, Corbello acknowledged that he believed that during the showup procedure he had "picked the guy with the dreadlocks as the guy that pulled the gun," but was also certain he had identified the man wearing the torn coat as having pulled out the gun. After the show up, Myvett and Jackson were taken to the police station and processed. Police recovered from Jackson a torn, brown puffy coat and a pair of black sneakers with red shoe laces. (Photographs of these items were presented to the jury.) After the show-up at the White Castle, Corbello and Barry, among other witnesses, were then asked to proceed to the local precinct for further interviews.

---

elements of the description seemed to match Myvett more closely than Jackson: Myvett, not Jackson, had a beard and mustache (*compare* Def. Ex 7 (Myvett) *with* Def. Ex. 8 (Jackson); Myvett was driving the car when he and Jackson were stopped; and Myvett is about 5'8" tall while Jackson is 6'1". In addition, a 911 call from one of the White Castle employees identified the man with a gun as "a dude in a black shirt," a description that also matches the clothing that Myvett was wearing. Def. Ex. 10.1c.wav; Def. Ex. 10.Event Query.pdf; Def. Ex. 7 (Myvett arrest photo). It was not established, however, that the defendant officers were aware of that description (though it is reflected in the OEMC event query relating to the shooting).

[5] Demetrius Barry did not testify at trial; his deposition testimony was presented instead. In his deposition testimony, Barry could not recall being interviewed at the White Castle or what he said to the officers conducting the show up. Detective Almdale's interview notes, however, reflected that Barry indicated that he saw "dreads pull gun" and had identified "dread" as the "man with gun." Almdale's notes do not include a reference to a torn coat. Plt. Ex. 7.

Detectives Almdale and Heerdt were assigned to investigate the White Castle shooting. Almdale testified that he received the White Castle assignment at approximately 3:30 a.m. on November 27, 2010 and headed directly to the scene. Sergeant Barker told him that a number of witnesses had been taken down to the local Chicago precinct station for processing and that no shooter had been identified. Almdale could not recall receiving any other information about the results of the show up before he left the White Castle and headed back to the station to interview the witnesses. Detective Heerdt remained at the White Castle for a period of time and then joined Almdale at the station. While at the station, Heerdt spoke to officer Sage Allenson, who had spoken to the victim at the scene; Allenson related that the victim had indicated that the shooter was wearing black gym shoes with red laces. Heerdt saw Jackson in the lockup at the station wearing black shoes with red laces and inventoried the shoes. Heerdt also knew that Jackson had been wearing a torn, brown coat and had visible injuries to his face resulting from the fight.

Detective Almdale acknowledged during his testimony that none of the witnesses interviewed had identified Myvett by name as the shooter in the White Castle incident. Among the individuals Almdale interviewed were Martin Corbello and Demetrius Barry. According to Almdale, as Corbello provided his account of events, Corbello never referred to the individual who brandished the firearm by name. Instead, Corbello simply referred to the shooter as the individual with "dreads." Almdale testified, contrary to Corbello's testimony, that Corbello never identified the shooter as wearing a torn brown puffy coat, which Almdale conceded would have been a clear indicator that Jackson, not Myvett, was the shooter. Corbello also testified that, while he used the term "dreads" in describing the individual who pulled the gun out, the reports of his interview by Almdale "just didn't jive with what I recall saying" about the two individuals involved in the fight and insisted that he identified the shooter as having worn a torn, puffy coat.

Later that day, Almdale and Heerdt interviewed Allen in the hospital, first by themselves, and then accompanied by Assistant State's Attorney Maher Fakhoury, the felony review ASA, after his wound had been treated. Allen positively identified Wilbur Jackson from a photo spread as the shooter and added that Jackson was wearing black shoes with red shoe laces. According to Almdale, Allen also identified Myvett from the same photo spread as the other man who had been involved in the struggle for the gun, though he never identified Myvett as having produced the gun. According to Heerdt, Allen's friend, Cameron Thompson, corroborated Allen's identification when he stated that he was present at the White Castle and was positive that the shooter was not Myvett and was "50 percent sure" the guy with the gun was Jackson. Thompson's statement that Myvett was not the shooter, however, was not included in the supplemental report written by Almdale and Heerdt, an omission Heerdt characterized as an oversight.

Both Almdale and Heerdt agreed, moreover, that the White Castle surveillance video shows that Myvett was already outside the White Castle at the time Corbello and friends fled from the restaurant—*i.e.,* when the gun appeared. Nevertheless, Almdale and Heerdt testified that they watched the video a number of times the morning of the shooting—and at other points during the course of the prosecution—but found that it contained "few usable images" and discounted its contents because they were looking to see whether the video showed someone with a gun—which the White Castle video does not. On cross-examination, however, Heerdt conceded that—although grainy—the video was useful in establishing a timeline of events and in establishing Myvett's location in relation to those events, and that timeline contradicts the statements about Myvett's involvement in the fight that Almdale attributed to Corbello and Barry

in his report. "In retrospect," Detective Heerdt acknowledged, "it probably would have been a good idea" to go through the video with the witnesses.

The initial arrest reports and Case Incident Report were completed by Officers Kalfas and White by approximately 7:00 a.m. on November 27, 2010. The arrest reports state that Myvett "was positively identified as the offender, who . . . pulled out a handgun and fired it at victim Reginald Allen." The Case Incident Report is similar. The Felony Review Form 101, completed by Detective Almdale after Allen had been interviewed at the hospital (and after Allen had definitively told them that Jackson, not Myvett, had been the shooter), stated that Corbello and Barry had observed Myvett pull the gun out, that a struggle for the gun ensued, and that Jackson gained control of the gun and shot Allen in the leg. The Felony 101 report did not detail Allen's identification of Jackson as the shooter, Thompson's corroboration of that fact, the match between Jackson's attire (torn puffy coat and red shoelaces) and that of the shooter, or the fact that the video footage showed that Myvett was not in the restaurant when the gun was pulled out. A felony review packet, which included the Felony 101 report as well as the arrest reports and other reports generated by other officers, was submitted to ASA Fakhoury (who had also interviewed the witnesses who went to the 20th District early that morning, including Corbello and Barry), who approved, at about 3:00 p.m. that day, felony charges against both Myvett and Jackson for aggravated battery with a firearm. The complaints filed against Myvett and Jackson, which Detective Heerdt signed on Allen's behalf (since Allen was still in the hospital), were identical; neither specifically identified the shooter; both alleged that the battery occurred while each defendant "was armed with a firearm." Detective Heerdt testified, however, that by the time he completed the complaints, the theory was that Jackson was the shooter and that Myvett was responsible as an accomplice because he had been involved in the struggle for the gun.

On November 28, the day after their arrests, Myvett and Jackson proceeded to bond court. During the bond hearing, the Assistant State's Attorney (not ASA Fakhoury) represented to the court that it was Myvett who got into an argument with, and shot, Reginald Allen. Oddly and inexplicably (because the bond court ASA did not testify at trial[6]), he also told the court that Myvett and Jackson had gone to Allen's home and shot him there; no such information was included in the felony review packet. The ASA also disclosed that, at the time of the shooting, Myvett had three prior felonies including a conviction for unlawful use of a firearm by a felon in 2000 (when he was 17 years old).[7] Ultimately, Myvett's bond was set for $250,000, while Jackson's bond was set for $150,000.[8] No evidence was presented at trial as to what factors the judge specifically considered in setting the bond, why the bond was set at that level, why

---

[6] This ASA was not timely disclosed as a witness by the plaintiff and was therefore barred from testifying. In the same ruling, the Court indicated that the transcript of the bond hearing could be introduced at trial, but neither side offered it into evidence. The principal evidence about what occurred at the bond hearing, therefore, was Myvett's testimony, supplemented by some brief testimony from ASA Joy Repella (who was not present for the original bond hearing) that was based on her review of the transcript of the original hearing.

[7] The transcript of the initial bond hearing (which, again, was not offered into evidence) also reflects that Myvett was already on bond on a charge of driving under the influence at the time of this incident, that the bond court granted the state's petition to violate his bond on that charge, and that he was held without pending a hearing on the violation petition before the judge assigned to that case. No evidence was presented as to what occurred at the subsequent hearing on the bond violation petition on the DUI charge, but it is clear that the "no bond" on that charge remained in effect through the second bond hearing in Myvett's criminal case, which was held in July 2011. The transcript of that hearing (which, like the transcript of the first bond hearing, neither party introduced at trial) reflects that the "no bond" on the DUI charge was still in place as of that date. As part of Myvett's effort to reduce the bond in the attempt murder case, he also asked the judge to set bond in the DUI case. The judge did vacate the "no bond" in the DUI case and entered instead a bond of $200,000 on that charge, in addition to the $250,000 bond that remained in place on the attempt murder charge.

[8] According to the transcript of the initial bond hearing, Jackson had four prior felony convictions (to Myvett's three), yet his bail was set at $150,000 versus Myvett's bail of $250,000. Although that fact provides significant support for Myvett's argument that his higher bail was the product of the false information about his role in the offense, he did not present this evidence at trial.

Myvett's bond was higher than Jackson's, or whether Myvett would have been able to post bond if bail had been set at a lower amount.[9]

Myvett and Jackson were indicted on or about December 14, 2010, on charges of attempt murder and aggravated battery. Although the indictment is not in the record, it was undisputed at trial that the indictment charged Jackson as the shooter and charged Myvett under an accountability theory. Prior to indictment, detectives Almdale and Heerdt completed their Case Supplementary Report (submitted by Detective Almdale) on December 12, 2010. That report included summaries of interviews of Corbello and Barry indicating that they had identified Myvett as the individual who first pulled out the gun and of Allen's statements that Jackson, not Myvett, was the shooter and that Myvett was the other individual involved in the struggle for the gun. The detectives' Supplementary Report also indicated that Allen told Officer Sage Allenson at the scene (*i.e.*, before he was taken to the hospital) that the shooter had been wearing black gym shoes with red laces. It contains no reference to statements reflecting that the shooter was wearing a torn brown coat.

The ASA assigned to the case, Joy Repella, testified at trial. On direct examination, she testified that she reviewed all of the reports that had been generated by investigating police officers and detectives in the case and understood before the case was indicted that Jackson, not

---

[9] Evidence that Myvett had some financial resources, however, was presented. At the time of his arrest, Myvett had been living with Ruth Walters, the mother of his two daughters, for about ten years. During the three years preceding his arrest, Myvett (who graduated from high school and has some college credits) worked as a factory worker and an auto mechanic and his employment contributed to the family's resources. Walters worked as a real estate agent and just prior to Myvett's arrest, Walters and Myvett had just purchased a house for investment purposes that they were renting to Myvett's uncle. Myvett was able to afford to hire defense counsel for his criminal trial and his lawyer subsequently sought a bond reduction (though the amount of reduction he sought was unspecified, the action suggests that there was some possibility that Myvett could have mustered the resources to post bond at some level). Myvett was unable to post the $250,000 bond ($25,000 would have been required), however, and he remained in custody through the date of his acquittal at trial in December 2011.

Myvett, was the shooter and that, accordingly, Jackson had been indicted as the person who was responsible for actually discharging the firearm. ASA Repella testified that Myvett had been indicted on an accountability theory, because he had been identified as having been involved in the struggle that resulted in Allen's shooting. She also confirmed that from the time of indictment, the decision whether to continue the prosecution was her decision and that she could have terminated the prosecution at any time she believed it was not justified. Repella opposed Myvett's motion for a directed verdict at trial because she believed that the evidence supported guilty verdicts for Myvett on an accountability theory.

Some eight months after the indictment, in July 2011, Myvett's attorney in the criminal case (Jeff Neslund, who also represented Myvett in this case), brought a motion to reduce bond. As Repella acknowledged on cross-examination, notwithstanding the fact that Jackson had been indicted as the shooter, she also told the trial judge hearing the bond reduction motion that two witnesses had identified Myvett as the shooter.[10] Following the hearing on the motion, the judge denied the motion and Myvett remained in custody.

In December 2011, Myvett was tried on the attempted murder and aggravated battery charges. During the trial, no witness testified that Myvett shot Allen or that he struggled with Allen for control over the firearm. To the contrary, Corbello testified that it was Jackson who shot Allen—not Myvett. At the close of the state's presentation of evidence, the trial judge granted the defense motion for a directed verdict and dismissed the charges against Myvett.

---

[10]  On direct examination, Repella testified unequivocally that at the time of the indictment she knew that Myvett was not the shooter and that he had been indicted on an accountability theory. On cross, however, she acknowledged that she had told the trial court that "there already is a dispute about what the evidence will show because indeed there are two witnesses at the scene who describe the shooter as being Mr. Myvett."

## ANALYSIS

Judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Rule 50(b) allows a party to renew a motion for judgment as a matter of law within 28 days of an adverse jury verdict. Fed. R. Civ. P. 50(b). In considering a Rule 50(b) motion, the court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook Cty.*, 689 F.3d 655, 659 (7th Cir. 2012). Although the court "must determine that more than a mere scintilla of evidence supports the verdict," it must not "make credibility determinations or weigh the evidence." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013) (citations and internal quotation marks omitted). Rather, the role of the court is to "decide whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion." *Id.*

At the close of the Myvett's presentation of evidence, the defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a)(1), arguing that Myvett's due process claim failed as a matter of law because he was not convicted at trial and that he had failed to prove that evidence fabricated by the defendants caused him to be deprived of his liberty. The defendants also asserted that Myvett's malicious prosecution claim must fail because the defendant law enforcement officers had probable cause to arrest Myvett for aggravated battery against Reginald Allen. Last, the defendants argued—as they did unsuccessfully at summary judgment—that they were entitled to qualified immunity. The Court took the motion under advisement, and after the jury returned its verdicts, the defendants timely renewed the motion pursuant to Federal Rule of Civil Procedure 50(b).

## I.    Due Process Claim

At trial, the jury found against Detective Almdale on Myvett's due process claim. Almdale now moves to have that finding set aside. In *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012), the Seventh Circuit recognized that the due process clause prohibits state officials from using manufactured evidence in criminal proceedings in a way that causes an individual to suffer a deprivation of liberty. *Id.* at 580. Almdale argues that the jury verdict against him on Myvett's due process claim is erroneous as a matter of law because, notwithstanding any fabrication of witness statements, Myvett had a viable state law remedy in the form of his tort claim for malicious prosecution. Defs.' Mot. 2, ECF No. 146. In other words, Almdale is arguing—without fully saying as much—that the Supreme Court's decision in *Parratt v. Taylor*, 451 U.S. 527 (1981), bars Myvett's due process claim. Almdale also maintains that Myvett's due process claim should be set aside because the allegedly fabricated evidence did not cause Myvett's loss of liberty (his 13 months of pretrial detention).

### A. Application of *Parratt* to Myvett's Due Process Claim

The Court rejected Almdale's challenge to the due process claim in denying the defendants' motion for summary judgment, noting that the Seventh Circuit has repeatedly recognized the viability of a due process claim asserting that a defendant's fabrication of evidence caused a deprivation of liberty. *See* Dkt. 96 at 6 (citing *Whitlock* and *Saunders-El v. Rohde*, 778 F.3d 556, 560-61 (7th Cir. 2015)). In support of his renewed challenge, Almdale relies on the analysis set forth by Judge Feinerman in *White v. City of Chicago*, 149 F. Supp. 3d 974 (N.D. Ill. 2016), which concluded that, notwithstanding these cases, circuit authority does not permit a plaintiff who was not convicted at trial to pursue a due process claim premised on the fabrication of evidence. *Id.* at 983.

Although the analysis in *White* does an admirable job of attempting to reconcile seemingly divergent lines of authority that bear on the viability of a due process claim premised on the fabrication of evidence, it does not persuade this Court to deviate from the unequivocal direction the Seventh Circuit provided to district courts in *Saunders-El*. In that case, the Court of Appeals expressly rejected any interpretation of circuit precedent suggesting "that evidence fabrication-based due process claims can never form the basis of a constitutional tort." 778 F.3d at 560. The Court explained that this erroneous interpretation was "inaccurate" and based on a misunderstanding of prior cases, such as *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), *Brooks v. City of Chicago*, 564 F.3d 830 (7th Cir. 2009), and *Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010). Those cases, the Court explained, confirmed only that malicious prosecution claims—that is, claims premised on the initiation of criminal proceedings without probable cause—could not be pursued under § 1983 where state law provides a tort remedy. 778 F.3d at 560, 561. Due process claims premised on post-arrest deprivations of liberty are a different animal, however, and the Seventh Circuit stated that "[n]one of these decisions—individually or as a collection—stands for the proposition that fabricating evidence does not violate a defendant's due process, actionable pursuant to § 1983." *Id.* The Court of Appeals therefore held in *Saunders-El* that the district court had "erred in holding, *categorically,* that a claim of evidence fabrication cannot form the basis of a due process claim under § 1983." *Id.* (emphasis in original).[11]

_____

[11] Similarly, in *Fields v. Wharrie*, 740 F. 3d 1107, 1114 (7th Cir. 2014), the Seventh Circuit denied immunity to a prosecutor alleged to have fabricated witness testimony used to secure his conviction, citing *Napue v. Illinois*, 360 U.S. 264 (1959), and other Supreme Court cases in flatly holding that "a government lawyer's fabricating evidence against a criminal defendant was a violation of due process." In *Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014), the court again confirmed that "there is a cognizable claim" for violation of due process where it is alleged that police manufactured evidence used to prosecute him.

*White* does not go quite so far as to say that fabrication of evidence claims can never give rise to a due process claim; instead, it sought to reconcile *Whitlock* with *Newsome* and *Fox* by limiting *Whitlock*'s recognition of due process evidence fabrication claims to cases in which "the deprivation results from a criminal conviction." 149 F. Supp. 3d at 981. But, respectfully, that holding rests on a distinction between pre- and post-trial deprivations of liberty that is both untenable as a matter of logic (surely one held in custody on the basis of fabricated evidence used against him before trial is no less aggrieved than one held in custody after a conviction secured with the aid of fabricated evidence) and which was squarely rejected by *Saunders-El.* There, the Seventh Circuit concluded that the plaintiff had no due process claim, but not just because he was acquitted at trial; Saunders-El had no due process claim both because he had been acquitted at trial and because he had been "released on bond following arrest." 778 F.3d at 561. *White* does not address this aspect of *Saunders-El*, citing it only for the uncontroversial, but irrelevant, proposition that a state law malicious prosecution claim renders § 1983 unavailable as a vehicle for bringing a federal malicious prosecution claim. *Id.* at 980.[12] The question here is not whether a plaintiff may bring a federal claim for *malicious prosecution*, but for *a violation of due process*. As to that question, *Saunders-El* unequivocally instructs that, when evidence fabrication works a significant deprivation of liberty, the answer is yes. 778 F.3d at 560.

Other cases from the Seventh Circuit have made the same point. *Saunders-El*, for example, pointed to the Circuit's earlier decision in *Alexander v. McKinney*, 692 F.3d 553 (7th Cir. 2012), in which the Court endorsed the proposition that a due process claim will lie where a

---

[12] Similarly, here, unlike in *Fox*, the claim is not simply that the plaintiff was prosecuted without probable cause, "thereby causing [his] false arrest," but rather that he was denied his fundamental right to fair criminal proceedings. *See Fox*, 600 F.3d at 841. Thus, the Fourth Amendment "shoe-horning" issue present in *Fox* that was also a basis for that court's ruling is not present here.

plaintiff spent months in pretrial custody after bail was revoked on account of fabricated evidence. *Id.* at 561. The Seventh Circuit reiterated the point in *Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016). There, our court of appeals held that the plaintiff's evidence fabrication claim failed to state a due process violation because he suffered no liberty deprivation. *Id.* at 319-20. While noting that the plaintiff was never convicted at trial, the appellate court also took pains to note that Bianchi suffered no deprivation of liberty because he had been released on bond immediately after arrest. *Id.* at 320 (citing *Saunders-El*, 778 F.3d at 556). Indeed, the Court noted that the plaintiffs had withdrawn an allegation that they had been held in custody following their arrests, noting their concessions to be significant to the outcome of the case. Then, in discussing the due process claim, the Court expressly reaffirmed the holdings of *Whitlock* and *Fields II* that "[a]llegations of evidence fabrication may state a colorable due-process claim" where the fabricated evidence "is later used to deprive the [criminal] defendant of her liberty ***in some way***." 818 F.3d at 319 (emphasis added). *See also Cairel v. Alderden,* 821 F.3d 823, 831 (7th Cir. 2016) (recognizing, but rejecting, due process claim where plaintiffs "were quickly released on bond following their arrests"). Almdale cited *Bianchi* as support for his argument, but it is impossible to read *Bianchi* to support a view that pretrial deprivation caused by the submission of fabricated evidence is not actionable under the due process clause.

Judge Feinerman's opinion in *White* appropriately cautions against concluding that older Circuit precedent has been overruled by more current precedent when the Circuit has not said as much. Respectfully, however, in this instance the Circuit has said as much. In *Saunders-El*, the panel expressly said that its recognition of due process claim predicated upon fabricated evidence that leads to a significant deprivation of liberty was not foreclosed by, or inconsistent with, cases like *Newsome* and *Fox*. In *Bianchi*, the court of appeals similarly confirmed that

"[a]llegations of evidence fabrication may state a colorable due-process claim in the wake of our decisions in *Whitlock* and *Fields II*." 818 F.3d at 319. Due respect for circuit precedent, then, requires this Court to recognize such a cause of action to the extent those cases do so. And those cases recognize that both pre- and post-trial deprivations of liberty occasioned by fabricated evidence give rise to a due process claim which may be pursued under § 1983.

What is perhaps this Circuit's most complete exegesis of the rationale for recognizing due process deprivation of liberty claims under § 1983 can be found in *Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015). There, the Seventh Circuit expressly rejected the rationale underlying *White*, namely that the *Parrat* doctrine bars due process claims premised on fabricated evidence because state law claims for malicious prosecution provide an adequate remedy.

In *Parratt*, the Supreme Court held that the defendant prison guards' negligent loss of the plaintiff prisoner's property did not amount to a procedural due process violation because the prisoner could seek damages through a state law tort suit. 451 U.S. at 541. In rejecting the plaintiff's argument that he was entitled to a hearing before a state actor could permanently deprive him of his property, a pragmatic Court reasoned that such a hearing was impossible because the guards' conduct was "random and unauthorized," as opposed to the result of following an established state procedure. *Id.* In other words, procedures for pre-deprivation notice and hearing would not have prevented the guards' random and unauthorized destruction of the plaintiff's property, so a failure to follow such procedures does not constitute a violation of due process. *Id.* at 541-43; *see also Armstrong*, 786 F.3d at 544-45 ("[T]he *Parratt* doctrine responded to a practical problem in a narrow subset of procedural due process cases, where a plaintiff contends that the state must provide notice and a hearing before carrying out a deprivation of liberty or property, but where a pre-deprivation hearing simply is not practical.").

The Court reasoned that so long as an adequate post-deprivation remedy was available, such as a state law tort claim, the prisoner received all the process that was feasible. 451 U.S. at 541-42.[13]

As the Seventh Circuit explained in *Armstrong*, the apparent tension between the *Parratt* doctrine and the recognition of due process violations based on fabricated evidence resolves when it is understood that "the doctrine of *Parratt v. Taylor* . . . does not apply to the actions of law enforcement officers that undermine the fairness of a criminal trial." *Id.* at 532. In *Armstrong*, the plaintiff brought a due process claim based on the government's destruction of exculpatory evidence on two different occasions. *Id.* at 539. First, he alleged that the prosecutor allowed the destruction of exculpatory evidence before his trial, which resulted in the plaintiff's conviction on a charge of murder and his imprisonment until the Wisconsin Supreme Court vacated his conviction and ordered a new trial. *Id.* at 532. Second, he maintained that after the state court ordered a new trial, two state lab technicians deliberately destroyed an exculpatory DNA sample, resulting in continued detention even after a new trial had been ordered. *Id.* Ultimately, the court dismissed the charges and a second trial never occurred.

The *Armstrong* defendants maintained that, even if true, such allegations were governed by *Parratt* because they were the product of random law enforcement misconduct and the plaintiff had an adequate remedy via a state law malicious prosecution claim. *Id.* In rejecting this assertion, the *Armstrong* court pointed to Justice Kennedy's opinion in *Albright v. Oliver,* 510 U.S. 266 (1994),[14] which recognized that the *Parratt* doctrine would be inapplicable in cases

---

[13] In *Hudson v. Palmer*, 468 U.S. 517, 533 (1984), the Court extended *Parratt* to intentional deprivations of property, and in *Zinermon v. Burch*, 494 U.S. 113, 139 (1990), to situations involving deprivations of liberty.

[14] Justice Kennedy's concurring opinion has been treated as controlling because his concurrence is "viewed as that position by those Members who concurred in the judgment on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977); *see Armstrong v. Daily*, 786 F.3d 529, 540 (7th Cir. 2015) ("We find support for this distinction in Justice Kennedy's

involving the deprivation of "fundamental fairness" in criminal proceedings. 786 F.3d at 540. The *Armstrong* panel distinguished *Oliver*, noting that the claim in that case was "only that the plaintiff had been prosecuted without probable cause. Unlike [Armstrong], there was no claim that a law enforcement official acted in bad faith to undermine the reliability of a trial, ***such as by the manufacturing of false evidence, arranging for perjured testimony***, or destroying exculpatory evidence." *Id.* (emphasis added). Thus, the *Armstrong* plaintiff's claims of fabrication and destruction of evidence fell within Justice Kennedy's recognized limitations of *Parratt* because such claims involved rights essential to the fairness of criminal prosecutions. *Id.* Thus, the underlying justification of *Parratt* discussed previously—that pre-deprivation notice and hearing were simply not feasible in cases of random and unauthorized misconduct—is inapposite where, as here, the plaintiff seeks to vindicate substantive due process protections rather than procedural safeguards. *Id.*

*White* rejects *Armstrong*'s relevance because it "did not even address an evidence fabrication claim," 149 F. Supp. 3d at 981, and because the plaintiff had previously spent some 29 years in prison before his conviction was vacated. But the holding of the case has nothing to do with the prior incarceration; the issue at bar was the viability of the due process claim for Armstrong's continued pretrial detention while the state assessed whether to retry him. The defendants argued that because that second trial never happened, and thus he was only subject to pretrial detention, no due process violation occurred. *Id.* at 551. The Seventh Circuit flatly rejected that argument, noting that although "the most common liberty deprivation cases are based on post-trial incarceration after a wrongful conviction, the essential elements of this constitutional claim are more general and not limited to wrongful convictions." *Id*. The court

concurring opinion in *Albright v. Oliver* [citation omitted], which we have treated as controlling.").

went on to add that a "[due process claim] should not be limited to its most common version by a too-narrow requirement that the accused have been tried and convicted." *Id.* at 553. Thus, it follows that if the accused does not need to be tried and convicted for a deprivation to occur, something short of a conviction—such as pretrial detention—is sufficient.

Accordingly, this Court concludes that the Seventh Circuit has affirmed, repeatedly, that a due process claim will lie when fabricated evidence is used to deprive a criminal defendant of liberty, even when the prosecution of that defendant is ultimately unsuccessful. Myvett's due process claim therefore passes muster.

### B. Causation

The second issue raised by Almdale with respect to Myvett's due process claim is causation. To sustain a fabrication of evidence due process claim, a plaintiff must prove that the evidence was used against him to deprive him of his liberty. *Armstrong*, 786 F.3d at 553 ("there is no tort without an actionable injury caused by the defendant's wrongful act"); *see also Saunders-El*, 778 F.3d at 561; *Alexander*, 692 F.3d at 557. As with tort liability, to establish causation a plaintiff must prove that the evidence was both a "cause-in-fact" and the "proximate cause" of the alleged deprivation. *Whitlock*, 682 F.3d at 582. Almdale maintains that, putting aside the question of whether he fabricated witness statements, no reasonable jury could have found that his statements *caused* Myvett to be deprived of his liberty. Myvett responds that Almdale's fabricated witness statements were relied upon by prosecutors at each stage of the criminal proceedings and formed the foundation of the criminal case against him; thus, a sufficient causal connection exists between the fabricated statements and his pretrial detention. Viewing all evidence in Myvett's favor, as this Court must on a Rule 50 motion, a reasonable

juror could have found that Myvett offered enough evidence at trial to satisfy both causation elements.

### 1. Cause-in-Fact

First, a reasonable juror could have found that Myvett proved by a preponderance of the evidence—*i.e.,* that it was more likely than not—that the false information provided to the bond court was used to deprive Myvett of his liberty. To establish this threshold requirement of causation, a plaintiff need only show that "the injury would not have occurred absent the conduct." *Id.* In *Whitlock*, the court noted that if fabricated evidence was the crux of the prosecution's case, a plaintiff can show that the fabrication was a but-for cause of the alleged deprivation. *Id.* at 583. Here, there can be no question that the crux of the initial charges against Myvett was the false information that Myvett had produced the gun and shot Reginald Allen. Here is the entirety of what the judge who set Myvett's bond heard about the facts of the case:

> On November 27, these two defendants went to the home of the victim, Reginald Allen. The defendant Myvett got into an argument with Allen. Defendant Myvett fired a weapon, a handgun, striking the victim Allen in the leg, a wound through and through. Wounds are not considered mortal. These defendants then fled together.

Transcript of November 28, 2010 Bond Hearing at 2:13-20. And in fact, because the defendants did not introduce the transcript of the bond hearing, the jury heard even less than this about what the court was told. Based on Myvett's testimony, the jury heard only that Myvett "was known to display a handgun," got into an "altercation with Reginald Allen," and "pulled out a handgun and . . . shot Reginald Allen in the leg."

As discussed further below, absent the false information that Myvett pulled out a gun and shot Allen, the jury could reasonably conclude that the defendants lacked probable cause to charge Myvett with aggravated battery based on the information they had obtained. Myvett's basic response to Almdale's causation argument, then, has merit: it was reasonable for the jury to

conclude that but for the false information provided to the court about his role in the altercation and shooting of Allen, there was not probable cause to charge Myvett with an aggravated battery of Allen. And since Myvett could not have been charged absent the false information (or so the jury could reasonably conclude), it was also reasonable for the jury to conclude that the false information provided to the bond court was a but-for cause of the ensuing thirteen months that Myvett spent in custody.[15]

Almdale maintains that Myvett failed to elicit evidence indicating that the information presented to the bond court included the fabricated reports of witness statements. Not so: Detective Heerdt admitted on the witness stand that the witness statements identifying Myvett as the shooter were presented to the bond court as part of Myvett's arrest packet. The jury also heard Myvett testify that the ASA present at the bond hearing told the bond court judge that Myvett had brandished a handgun inside the White Castle and shot Reginald Allen in the leg. The ASA's only possible source of that information, given that no witness actually provided that account, were the reports provided in the Felony Review packet, which included Almdale's Felony 101 report. Drawing all reasonable inferences in Myvett's favor, as required on a Rule 50 motion, the jury could conclude that this information was material to the court's determination of

---

[15] It bears noting here that the inquiry relevant to the due process claim against Almdale is whether false statements by Almdale were a but-for cause of Myvett's pretrial detention, not whether they led to his indictment or the further prosecution of the charges against him. Almdale's response brief argues that false information "was placed into official police reports that would be used in every aspect of the criminal prosecution," Dkt. 155-1 at 10, but that sweeps too broadly. Myvett was acquitted at trial and therefore suffered no post-trial deprivation of liberty; he therefore has no cause of action for a due process violation predicated on the use of fabricated evidence to indict him or at trial. The deprivation of liberty Myvett suffered was the 13-month period of pretrial custody he served because he could not post bond after the original charges were brought against him.

the appropriate bond to set.[16] This inference is strengthened by the fact that bond for Wilbur Jackson—who was not identified as the shooter at the initial bond hearing—was set significantly lower, at $150,000.

Almdale also maintains that at a second bond hearing, in July 2011, the misleading information identifying Myvett as the shooter "was corrected," Defs.' Mot. 10, but his bond remained unchanged. He reasons that because Myvett's bond remained the same even when the correct information was provided to the judge, there was no basis for a jury to conclude that his fabricated police reports influenced Myvett's initial bond amount.

That is not an accurate characterization of the evidence presented at trial. In fact, ASA Repella continued to represent to the state trial court that two witnesses had identified Myvett as the shooter. When ASA Repella was asked on her direct examination if anything was presented differently during the second bond hearing, she testified that at the initial hearing Myvett was represented as the shooter, while at the second hearing he was not. Yet on cross-examination ASA Repella was required to acknowledge what she had not been asked by the defendants' counsel on direct, namely that—consistent with Myvett's earlier testimony—she indeed told the

---

[16] It is true, as the defendants note, that the bond court ASA also presented Myvett's criminal record, and it is possible that Myvett's three previous felony convictions influenced the amount of bond the court set. But that does not make the fabricated witness statements any less of a "but-for" cause of Myvett's liberty deprivation. The *Whitlock* court made clear that in conducting a due process causation analysis, standard tort principles control, 682 F.3d at 583, and it is well accepted that there may be multiple causes-in-fact for a single injury. *Burrage v. United States*, 134 S. Ct. 881, 888 (2014); *see also Brackett v. Peters*, 11 F.3d 78, 80 (7th Cir. 1993) ("An event is, as we have emphasized, typically the consequence of multiple causes."); *Loughman v. Consol-Pennsylvania Coal Co*., 6 F.3d 88, 106 (3d Cir. 1993) ("As both tort law and common sense tell us, there may be multiple but-for causes of a single loss."); *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013) ("'but-for' causation does not require proof that [the conduct] was the only cause."); *Webb v. Amato*, 210 F. Supp. 2d 1015, 1016 (N.D. Ill. 2002) (noting there can be multiple causes for an alleged injury); *Criswell v. Mobile Hous. Bd.*, No. 14-00447, 2016 WL 742112, at *12 (S.D. Ala. Feb. 24, 2016) ("it is a long-recognized tenet of tort law that a plaintiff's injury can have multiple 'but-for' causes").

bond court judge that two witnesses identified Paul Myvett as the shooter. The jury could, therefore, reasonably conclude that false information originally supplied by defendant Almdale continued to provide the foundation for Myvett's continued pretrial custody.

Almdale also argues that there is no evidence in the record to establish what Myvett's bond would have been absent the fabricated witness statements and no evidence that Myvett would have been able to post bond in any event. The primary and sufficient response to this argument, again, is that it was reasonable for the jury to conclude that but for the fabricated information, Myvett should not have been charged, let alone detained, so the false information constituted a but-for cause of Myvett's deprivation of liberty. But even if that were not the case, this argument would effectively require proof that fabricated evidence was the sole "but-for" cause for incarceration rather than one among many such causes. The suggestion that Myvett was required to present evidence enabling the jury to parse out the contribution of each factor that played a role in the determination of Myvett's bond, and to then assess whether without the marginal increase in the amount of the bond attributable to the use of fabricated evidence would have been able to post bond, would demand evidence that the fabricated evidence was the sole "but-for" cause of a bond set out of Myvett's reach, rather than one among myriad other potential "but-for" causes.

What is more, no such evidence exists. That is because the bond court judge was not presented with accurate information during the original bond hearing and no reliable post-hoc assessment of what the bond would have been could have been made years later during the trial of this case. To require Myvett to quantify the impact of a single piece of information on an aggregate assessment based on multiple factors demands the impossible. What could Myvett do to prove that some specific fraction of the bond was a result of the false information? Subpoena

the judge and ask for a do-over on the witness stand with the correct information and the benefit of hindsight? It is Myvett's burden to prove causation, but defendant Almdale is not entitled to the benefit of a standard that his own actions rendered unachievable. Take the case, for example, where fabricated evidence is used in a trial that results in a conviction: there is no way for a plaintiff to prove that the fabricated evidence in fact played the decisive role in the jury's decision to convict. We are left to infer, from the nature of the evidence and the role it played in the trial to assess the likelihood that had it not been introduced, whether the result would have been an acquittal.[17] Thus, in *Whitlock*, for example, even while confirming that fabricated evidence must be a but-for cause, the Seventh Circuit described the but-for inquiry in less categorical terms. *See* 682 F.3d at 582 (fabricated evidence was a but-for cause because it was introduced at trial). *See also, e.g., Fields v. Wharrie*, 740 F.3d 1107, 1111-12 (7th Cir. 2014) (fabrication of evidence "used to help indict" the plaintiff satisfies causation requirement); *Jones v. City of Chicago*, 856 F.2d 985, 993 (fabricated facts "likely to influence" the decision to prosecute satisfy causation requirement). Here, the seriousness of the conduct described by the false information (*i.e.,* that Myvett was instigator of the altercation and the shooter), the State's decision to present the information at both bond hearings, and common sense provide a reasonable probability that Myvett's bond would have been substantially lower if he had not been falsely identified by Almdale as the shooter. It was not unreasonable for a jury to conclude that Myvett met his burden to prove, by a preponderance of the evidence, that but for the false

---

[17] This is not unlike the situation posed by a violation of *Brady*, where the effect of a failure by the government to produce exculpatory information can never be established with certainty because, in light of the violation, the exercise is inherently speculative. In that context, a criminal defendant seeking a remedy must merely present evidence that there is a reasonable probability that the outcome would have been different if the information at the bond hearings had been accurate. *See United States v. Thomas*, 835 F. 3d 730, 735 (7th Cir. 2016) (*Brady* violations require only a "reasonable probability" of a different outcome to be actionable).

information provided at the bond hearing, he would not have been held in custody for the thirteen months that proceeded his acquittal at trial.[18]

## 2. Proximate Cause

Turning next to the question of proximate causation, it is apparent that a reasonable jury could have found that the defendants' conduct was the proximate cause of Myvett's liberty deprivation. Proximate cause generally turns on the foreseeability of the injury, and a defendant may be held liable "only for those injuries that might have reasonably been anticipated as a natural consequence of [his] actions." *Boim v. Quranic Literacy Inst. and Holy Land Found. for Relief and Dev.*, 291 F.3d 1000, 1012 (7th Cir. 2002). In determining foreseeability, "[c]ausation requires [the court] to analyze the relation between an official's conduct and a resulting injury; when, where, and exactly how that injury occurs is part of the proximate cause question." *Whitlock*, 682 F.3d at 583. Almdale offers one general causation argument that fits within the more specific "proximate cause" rubric: he maintains that his fabricated witness statement, even if it set Myvett's prosecution in motion, did not cause Myvett's deprivation because ASA Repella interviewed witnesses and evaluated the evidence to form her independent judgment of the case before proceeding. In other words, he argues that ASA Repella's decision to prosecute was an intervening act that should sever his liability.

---

[18] This is not to say that the impact of information at a bond hearing is always indeterminable. The defendants argue in their brief, for example, that Myvett would have been held in custody in any event since by virtue of his felony arrest he had violated conditions of bail to which he was subject based on a prior arrest. Dkt. 146 at 9. As noted above, although the transcripts of the two bond hearings support this argument, the defendants introduced neither those transcripts nor any other evidence to show that Myvett was on a "no bond" status in another case and would not have been released from custody even had his bond in the Allen shooting case been set at zero, so that specific argument goes nowhere. The defendants could have, but did not, present this evidence, so it has no relevance to consideration of the reasonableness of the jury's verdict.

The Seventh Circuit rejected a similar argument in *Jones v. City of Chicago*. 856 F.2d at 994. There, a jury returned a verdict against the defendant Chicago Police Detectives in the sum of $801,000 for a variety of due process and state law tort claims. *Id.* at 988. On appeal, the defendant detectives argued that the decision to prosecute the plaintiff was made by the ASA and thus, "all of [the plaintiff's] woes flow from that decision and not from their conduct." *Id.* at 993. In rejecting this argument, the Seventh Circuit reasoned that "a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision." *Id.* at 994; *see also Cervantes v. Jones*, No. 97 C 1520, 1997 WL 433685, at *4 (N.D. Ill. July 29, 1997).

Similarly here, Almdale cannot hide behind ASA Repella in an attempt to distance himself from Myvett's indictment and subsequent pretrial detention. As Myvett testified on direct examination, and as ASA Repella conceded in her own cross-examination, at both bond hearings the state represented to the court that there were two witnesses who identified Myvett as the shooter. Given that no witnesses actually provided that information to anyone during the course of the investigation, the only possible source of the witness statements were Almdale's inaccurate reports provided in the case file. Thus, as in *Jones*, Almdale cannot "hide behind the officials whom [he] defrauded," because without the erroneous witness statements he provided, the state would have had never any basis to represent to the bond court that Myvett was the shooter. *See id*.

Thus, viewing all the evidence in Myvett's favor, a reasonable juror could have found that Almdale's fabricated witness statements caused Myvett to endure thirteen months of pretrial detention.

## II.    Qualified Immunity

Almdale next argues, as he did unsuccessfully at summary judgment, that he is entitled to qualified immunity on Myvett's fabrication of evidence claim.

That argument fails now, just as it did then. In determining whether qualified immunity applies, the Court considers (1) whether the plaintiff has asserted a violation of a federal constitutional right, and (2) whether that constitutional right was clearly established at the time the alleged violation occurred. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). Almdale's arguments center on the second prong of the qualified immunity inquiry, but as the Seventh Circuit has made clear, "[f]abricating evidence, including witness testimony, violates a clearly established constitutional right, such that qualified immunity does not shield the manufacturers of such evidence from liability." *Saunders-El*, 778 F.3d at 560; *see also Whitlock*, 682 F.3d at 585-86 (holding that use of fabricated evidence to effect a deprivation of liberty violates the Due Process Clause was clearly established well before 1987, when the relevant events in that case occurred). Almdale attempts to distinguish *Whitlock* by noting that the defendant police officers in *Whitlock* had fabricated actual witness testimony, as opposed to police reports, as was the case here. He argues that because his reports are inadmissible hearsay, they are not "the type of 'evidence' contemplated by [the court in *Whitlock*]." Defs.' Mot. 12.

That distinction will not bear the weight the defendants place on it. *Whitlock* and its progeny stand for the proposition that if a police officer fabricates information that is used "in some way" to deprive a plaintiff of his liberty, then that officer has violated the very laws he has sworn to protect. *Whitlock*, 682 F.3d at 585-86. The Seventh Circuit made no suggestion in *Whitlock*, or any other case, that fabrication claims should somehow turn on the admissibility of the concocted information. Instead, what *Whitlock* illustrates is that so long as the fabricated

statements are used to deprive a plaintiff of his liberty in some way, then the defendant officers have violated his clearly established constitutional rights. Here, as discussed *supra*, that is exactly what happened (or so the jury could reasonably conclude).

### III.    Malicious Prosecution Claim

The defendants further maintain that the Court should set aside the jury's finding for Myvett on his malicious prosecution claims against Almdale and Heerdt because no reasonable jury could have found that the officers lacked probable cause to charge Myvett in connection with the events involving Reginald Allen. Defs.' Mot. at 11. Myvett counters that, other than his presence at the scene of the shooting, the defendants had no basis to charge him based on any involvement in an attack on Reginald Allen. The Court agrees with Myvett that a reasonable juror could have found that the defendants' lacked probable cause to charge Myvett with aggravated battery at the time of his arrest.

A finding of "[p]robable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa v. City of Chicago,* 442 F.3d 544, 547 (7th Cir. 2006). Probable cause exists "if a reasonable person would believe, based on the facts and circumstances known at the time, that a crime had been committed." *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009); *see also* *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000) ("Probable cause exists at the time of arrest when reasonably trustworthy information, facts and circumstances would lead a prudent person to believe that a suspect had committed or was committing a crime."). The determination of probable cause is objective—"an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

Although the probable cause standard is deferential, it does not "trump our duty to defer to a jury's findings," and the Court will not do so here. *Fox*, 600 F.3d at 833. To begin, it bears noting that the defense witnesses, and the defendants in particular, were thoroughly and repeatedly impeached with prior inconsistent statements and omissions from their reports, prior testimony, and discovery responses. The Court will not begin to catalog the myriad instances of such inconsistencies; one critical omission will serve to illustrate the point that the inconsistencies were such that the jury could have reasonably rejected the version of events the officers provided at trial altogether. Although Detective Almdale testified during trial that Allen identified Myvett with "100 percent" certainty as the second person (along with Jackson) who was struggling with Allen for control of the gun, Almdale's notes of the Allen interview stated only that Allen had said he was "100 percent positive" that the shooter was Jackson, and said nothing at all about an identification by Allen of the second person involved in the struggle for the gun. Almdale could offer no explanation for this critical omission other than that he may have been distracted by something else. The jury, of course, was free to conclude that Almdale's testimony about Allen's identification of Myvett was simply wrong (whether intentionally so or not). For his part, Detective Heerdt was also substantially impeached on this point. Heerdt also testified at trial that he was certain that Allen identified Myvett as being involved in the struggle for the gun. Yet in his prior deposition testimony, Heerdt had said that he was ***not*** certain of that fact. Based on this impeachment, the jury was entirely within its right to reject the testimony of both Almdale and Heerdt on this point and on many others as well.

Further, and as the jury was instructed at the conclusion of the presentation of the evidence, absent an affirmative duty to act, mere presence at the scene of a crime without more is an insufficient basis to arrest someone for a crime. *McFowler v. Jaimet*, 349 F.3d 436, 447-48

(7th Cir. 2003). Yet, at bottom, that is what the defendants argue is an appropriate basis for probable cause. For example, they assert that probable cause to arrest Myvett existed because he "admitted that he told police that he went to the White Castle with his friend, Wilbur Jackson," who, as it turns out, was the actual shooter. But even if that were the case, absent evidence of collusion, no reasonable officer could arrest someone simply because they accompanied a third party to a location where that person then commits a criminal act, as Myvett did here. Of course, these facts could lead a reasonable officer to conclude that Myvett was a person of interest that warrants further investigation. But an investigation occurs before the arrest, not vice versa, as was the case here.

The defendants also argue that probable cause existed because Reginald Allen reported that two people were involved in the fight, one being Jackson and (apparently conceding the unreliability of Almdale's testimony concerning Allen's identification of Myvett) the other being a person "who the victim could not identify" but who was struggling for control of the gun as well. Dkt. 146 at 12. Since Myvett was seen leaving the White Castle with Jackson, the defendants maintain that it was reasonable to believe that Myvett was that other individual. But flight from a crime scene with a guilty party is insufficient to establish that someone aided or abetted an offense, let alone that they actually committed that offense. *McFowler*, 349 F.3d at 447-48. Although such conduct may give rise to a reasonable suspicion that criminal activity is afoot, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), without more, it is insufficient to establish probable cause that a crime occurred. *Marshall ex rel. Gossens v. Teske*, 284 F.3d 765, 771 (7th Cir. 2002) (in upholding jury verdict against defendant police officers for false arrest, court noting that flight may give rise to reasonable suspicion but that it fails to satisfy the more demanding probable cause standard). Here, Myvett's departure from the scene of the shooting

would certainly have given the defendants the requisite reasonable suspicion needed to investigate him further, but it alone could not serve as the basis for a finding of probable cause. *See id.*

The defendants' assertion that there was probable cause to arrest Myvett because he arrived at the White Castle with Jackson is further undermined by the White Castle security video, which the jury viewed repeatedly. The video shows Myvett and Jackson entering the restaurant at different times. Once the fight breaks out, Myvett is seen leaving the restaurant while Jackson remains inside fighting with Reginald Allen. The video shows that by the time Myvett reentered the restaurant, the melee had already moved into the corner of the restaurant, at which point, according to eye witnesses, the weapon had already been brandished.

The defendants also maintain that Myvett admitted he was involved in a fight inside the restaurant. That is true as far as it goes, but the fight he admitted involvement in was a fight with Brian Smothers, not a fight involving Reginald Allen. Myvett denied any involvement in any argument, fight, or shooting of Allen and the jury could rationally credit that testimony, particularly since it was consistent with other evidence. That testimony alone is sufficient to sustain the jury's verdict that there was no probable cause to prosecute Myvett on charges stemming from the fight with, and shooting of, Reginald Allen.

The defendants argue that ASA Repella's testimony established that there was probable cause to charge Myvett. Implicit in this argument are two assumptions, each of which is flawed. The first is that ASA Repella's testimony that she independently evaluated the merits of the case before proceeding should be construed as her offering an expert opinion on the issue of the defendants' probable cause determination. It was specifically discussed during the pretrial

conference, and at sidebar during trial, that Repella would not be allowed to opine as an expert on the merits of Myvett's prosecution. Once again, the Court rejects the defendants' argument.

Second, the defendants appear to assume that Repella's independent evaluation of the case prior to trial somehow shields the defendants from their own transgressions. That is incorrect, as her subsequent assessment of the case is irrelevant to the question of whether the officers had probable cause to arrest Myvett and to initiate a charge of aggravated battery against him. As the jury was instructed, for purposes of a malicious prosecution claim, the pertinent time period for analyzing probable cause is at the time the charging document is filed. *See, e.g., Holland v. City of Chicago*, 643 F.3d 248, 254 (7th Cir. 2011). As ASA Repella testified, the charging decision was made by the attorneys in felony review before she was ever involved in the case. Thus, the fact that she went out and conducted her own witness interviews months after the charging documents against Myvett were filed (of which she provided no documentation) has no bearing on Myvett's malicious prosecution claim against the defendants. Nor can the defendants hide behind the felony review prosecutor's independent decision to charge Myvett, as the only information he possessed implicating Myvett as the shooter was the false reports of witness statements the defendants provided and on which Repella continued to rely prior to trial. *See Jones*, 856 F.2d at 994.

Thus, it is apparent that a reasonable jury could have found that the defendants lacked probable cause to charge Myvett with aggravated battery. Other than the fabricated witness statements, the only substantial evidence they provided linking Myvett to the shooting was his mere presence at the White Castle and subsequent flight with Jackson. The jury reasonably concluded that that evidence was insufficient to establish probable cause.

* * *

In conclusion, Myvett presented an adequate due process claim to the jury based on false reports of witness statements by Almdale and a reasonable jury could have found that Almdale and Heerdt lacked probable cause to initiate a prosecution of Myvett for aggravated battery on November 28, 2010. The jury might well have gone the other way, as well (and indeed did return verdicts in favor of Sergeant Barker on all counts and as to Almdale and Heerdt on some others). This was a case in which there were many disputed fact issues that the jury reasonably resolved in the plaintiff's favor; the jury was not required to resolve those disputes in favor of the defendant officers, particularly in light of the errors and omissions in the original report used to justify the charges against Myvett.

Date: January 9, 2017

_____
John J. Tharp, Jr.
United States District Judge